**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JUSTIN MICHAEL WOLFE,

       *Petitioner-Appellee,*

v.

HAROLD W. CLARKE, Director,
Virginia Department of
Corrections,

       *Respondent-Appellant.*

WILLIAM G. BASSLER; ROBERT C.
BUNDY; A. BATES BUTLER, III; W.
J. MICHAEL CODY; J. JOSEPH
CURRAN, JR.; ROBERT J. DEL TUFO;
W. THOMAS DILLARD; CONOR B.
DUGAN; JOHN R. DUNNE; MATTHEW
W. FRIEDRICH; BENNETT L.
GERSHMAN; JOHN GIBBONS; ISABEL
GOMEZ; STEWART HANCOCK; BRUCE
R. JACOB; GERALD KOGAN; THOMAS
D. LAMBROS; DAVID W. OGDEN;
STEPHEN M. ORLOFSKY; STEPHANIE
K. PELL; H. JAMES PICKERSTEIN;
RICHARD J. POCKER; CHRISTOPHER S.
RHEE; JEANNIE S. RHEE; H. LEE
SAROKIN;

No. 11-6

HARRY L. SHORSTEIN; GIL M.
SOFFER; THOMAS P. SULLIVAN;
RICHARD S. UGELOW; JAMES K.
VINES; ATLEE W. WAMPLER, III;
JAMES WEST; ALFRED WOLIN;
WILLIAM YEOMANS,

  *Amici Supporting Appellee.*

JUSTIN MICHAEL WOLFE,

   *Petitioner-Appellant,*

    v.

HAROLD W. CLARKE, Director,
Virginia Department of
Corrections,

   *Respondent-Appellee.*

       No. 11-7

WILLIAM G. BASSLER; ROBERT C.
BUNDY; A. BATES BUTLER, III; W.
J. MICHAEL CODY; J. JOSEPH
CURRAN, JR.; ROBERT J. DEL TUFO;
W. THOMAS DILLARD; CONOR B.
DUGAN; JOHN R. DUNNE; MATTHEW
W. FRIEDRICH; BENNETT L.
GERSHMAN;

JOHN GIBBONS; ISABEL GOMEZ;
STEWART HANCOCK; BRUCE R.
JACOB; GERALD KOGAN; THOMAS D.
LAMBROS; DAVID W. OGDEN;
STEPHEN M. ORLOFSKY; STEPHANIE
K. PELL; H. JAMES PICKERSTEIN;
RICHARD J. POCKER; CHRISTOPHER S.
RHEE; JEANNIE S. RHEE; H. LEE
SAROKIN; HARRY L. SHORSTEIN; GIL
M. SOFFER; THOMAS P. SULLIVAN;
RICHARD S. UGELOW; JAMES K.
VINES; ATLEE W. WAMPLER, III;
JAMES WEST; ALFRED WOLIN;
WILLIAM YEOMANS,

*Amici Supporting Appellant.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(2:05-cv-00432-RAJ-DEM)

Argued: May 17, 2012

Decided: August 16, 2012

Before KING, DUNCAN, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Thacker joined. Judge Duncan wrote a separate opinion dissenting in part.

**COUNSEL**

**ARGUED:** Katherine Baldwin Burnett, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellant/Cross-Appellee. Ashley Charles Parrish, KING & SPALDING, LLP, Washington, D.C., for Appellee/Cross-Appellant. **ON BRIEF:** Kenneth T. Cuccinelli, II, Attorney General of Virginia, Matthew P. Dullaghan, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellant/Cross-Appellee. Michele J. Brace, VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Charlottesville, Virginia; Daniel J. King, KING & SPALDING, LLP, Atlanta, Georgia; Matthew S. Owen, KING & SPALDING, LLP, Houston, Texas; Jane C. Luxton, PEPPER HAMILTON LLP, Washington, D.C.; Matthew L. Engle, Deirdre M. Enright, THE INNOCENCE PROJECT AT UVA SCHOOL OF LAW, Charlottesville, Virginia, for Appellee/Cross-Appellant. John P. Elwood, VINSON & ELKINS LLP, Washington, D.C.; Michael A. Heidler, VINSON & ELKINS LLP, Austin, Texas, for Amici Supporting Appellee/Cross-Appellant.

**OPINION**

KING, Circuit Judge:

This matter was previously before us on appeal by 28 U.S.C. § 2254 petitioner Justin Michael Wolfe, a Virginia prisoner who was convicted of capital murder and sentenced to death by the Commonwealth in 2002. By our decision of May 11, 2009, *see Wolfe v. Johnson*, 565 F.3d 140 (4th Cir. 2009) ("*Wolfe I*"), we remanded for further proceedings. Specifically, *Wolfe I* instructed the district court to determine whether Wolfe was entitled to an evidentiary hearing and other discovery; to decide in the first instance whether, under

*Schlup v. Delo*, 513 U.S. 298 (1995), Wolfe had made a sufficient showing of actual innocence to clear any procedural bars to his constitutional claims (the "*Schlup* issue"); and to assess anew Wolfe's claim, among others, that the prosecution had contravened his Fourteenth Amendment due process rights, as recognized in *Brady v. Maryland*, 373 U.S. 83 (1963), by suppressing favorable and material evidence (the "*Brady* claim").

On remand, the district court heeded our *Wolfe I* mandate, authorized appropriate discovery and conducted an evidentiary hearing, and ruled in Wolfe's favor on the *Schlup* issue and his *Brady* and two additional claims. By its judgment of August 30, 2011, the court vacated Wolfe's capital murder and other convictions, and ordered the Commonwealth to either retry him within 120 days or release him unconditionally from custody. The judgment was stayed pending this appeal by the Commonwealth, which was initiated on its behalf by respondent Harold W. Clarke, Director of the Virginia Department of Corrections.[1] The Commonwealth challenges the remand proceedings from start to finish, contending that the district court repeatedly and fatally erred in its procedural and substantive rulings. Because we readily conclude, however, that the court's award of habeas corpus relief on Wolfe's *Brady* claim was not marred by any error, we affirm the judgment.

I.

A.

As more fully detailed in our *Wolfe I* decision, a Prince William County jury found Wolfe guilty in 2002 of capital murder, using a firearm in the commission of a felony, and conspiring to distribute marijuana. *See Wolfe I*, 565 F.3d at

---

[1]Clarke has served as Director of the Virginia Department of Corrections since 2010, when he replaced former respondent Gene M. Johnson.

149. The trial court sentenced Wolfe to death for the murder, plus consecutive terms of three years for the firearm offense and thirty years for the drug conspiracy. *Id.* The murder conviction was premised on evidence that Wolfe, then a nineteen-year-old marijuana dealer in northern Virginia, hired his close friend and fellow drug dealer Owen Barber IV to murder drug supplier Daniel Petrole in March 2001. *Id.* at 144-45 & n.2 (explaining that "Virginia defines 'capital murder,' in pertinent part, as '[t]he willful, deliberate, and premeditated killing of any person by another for hire'" (quoting Va. Code Ann. § 18.2-31(2))). Significantly, "Barber was the prosecution's key witness," in that he was "the only witness to provide any direct evidence regarding the 'for hire' element of the murder offense and the involvement of Wolfe therein." *Id.* at 144. In exchange for Barber's testimony that he was Wolfe's hired triggerman, the Commonwealth dismissed its capital murder charge against Barber, and he pleaded guilty to non-capital murder. Barber was sentenced to sixty years in prison, of which twenty-two years were suspended. *Id.* at 144 n.1.

In November 2005, after failing to obtain relief from his convictions on direct appeal and in state habeas corpus proceedings, Wolfe filed his initial 28 U.S.C. § 2254 petition in the district court. *See Wolfe I*, 565 F.3d at 149-51. It was only thereafter, on December 14, 2005, that Barber executed an affidavit repudiating his trial testimony and exculpating Wolfe from the murder-for-hire scheme. *Id.* at 144, 151. Within a single day, Wolfe filed an amended § 2254 petition, along with an appendix of supporting materials, including additional affidavits corroborating the Barber affidavit and suggesting that the prosecution had suppressed evidence that should have been disclosed to the defense. *Id.* at 151. The amended petition raised, inter alia, the *Schlup* actual innocence issue, thereby asserting a second ground to excuse any procedural default of Wolfe's constitutional claims — the previously asserted first ground having been the separate "cause and prejudice" standard. *Id.* at 154, 158 & n.27. In April 2006, while the amended petition and related procedural issues were

pending before the magistrate judge, Wolfe notified the court that Barber sought to repudiate the statements in his 2005 affidavit exculpating Wolfe. *Id.* at 155-56. In conjunction with that notice, Wolfe's lawyers requested an evidentiary hearing to resolve credibility issues, plus discovery into the prosecution's compliance with its *Brady* obligations. *Id.* at 156.

In August 2007, the magistrate judge issued his report, rejecting Wolfe's request for an evidentiary hearing, deeming the Barber and other affidavits to lack credibility, and recommending the dismissal of Wolfe's amended petition on the ground that the claims asserted therein were meritless, had been procedurally defaulted, or both. *See Wolfe I*, 565 F.3d at 156 & n.25. Although Wolfe spelled out a lengthy series of objections to the magistrate judge's report, the district court, by its decision of February 11, 2008, adopted the report as its own and dismissed Wolfe's petition. *Id.* at 158-59 (explaining, inter alia, that the court did not address the *Schlup* issue, but "considered (and rejected) Wolfe's contention that his procedural defaults were excused under the cause and prejudice standard" (internal quotation marks omitted)). After the court declined to alter or amend its decision, we granted Wolfe a 28 U.S.C. § 2253(c) certificate of appealability on his *Brady* and three other claims. *Id.* at 159. And, as explained above, we ultimately remanded with instructions for the court to determine Wolfe's entitlement to an evidentiary hearing and other discovery, to decide the *Schlup* issue in the first instance, and to freshly assess the *Brady* and two additional claims. *Id.* at 171. We also advised the court that it was free to revisit its cause and prejudice ruling. *Id.* at 165 n.35.

B.

Without explicitly reconsidering its prior cause and prejudice ruling, the district court decided the procedural *Schlup* issue early in the remand proceedings, by its opinion and order of February 4, 2010. *See Wolfe v. Clarke*, No. 2:05-cv-

00432 (E.D. Va. Feb. 4, 2010) (the "*Schlup* Order").[2] The court therein determined, largely on the existing *Wolfe I* record, that Owen Barber's (subsequently disavowed) recantation of his trial testimony was sufficiently corroborated to "raise doubt in a reasonable juror's mind about the circumstances of the night of the [Daniel Petrole] murder." *Schlup* Order 10. Indeed — weighing the "two stories of what occurred on the night of the murder, both with hearsay corroboration[,] and almost no other evidence that would support one version over another" — the court concluded that it was "more likely than not that no reasonable juror would have found Wolfe guilty beyond a reasonable doubt." *Id.* (applying *Schlup*, 513 U.S. at 327 (requiring petitioner to "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence")). Accordingly, the court announced that Wolfe had "met the *Schlup* standard," thus justifying review of the merits of his procedurally defaulted constitutional claims. *Id.* The court also granted Wolfe's request for an evidentiary hearing, as well as discovery. *Id.* at 13.

During the contentious course of the discovery proceedings, Wolfe had to move to compel the Commonwealth to meet its discovery obligations. A June 4, 2010 hearing on Wolfe's motion revealed, inter alia, that the Commonwealth had provided only unsworn responses to the interrogatories it had answered, had wholly failed to respond to other interrogatories, and was refusing to produce approximately 916 documents that it unilaterally deemed irrelevant. By its order of June 7, 2010, the district court directed the Commonwealth to provide sworn responses to Wolfe's interrogatories, including those previously unanswered, and to allow Wolfe to examine the hundreds of theretofore undisclosed documents, subject to an agreed protective order. *See Wolfe v. Clarke*, No. 2:05-cv-

---

[2]The *Schlup* Order is found at J.A. 3266-78. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in these appellate proceedings.)

00432 (E.D. Va. June 7, 2010) (the "Discovery Order").[3] To give Wolfe an opportunity to assess the evidence that would be forthcoming under the Discovery Order, the court was constrained to postpone the impending evidentiary hearing.

The evidentiary hearing finally ensued late that autumn, when it was conducted over the four days of November 2-3 and 16-17, 2010. On the second day of the hearing, in response to the Commonwealth's objection to Wolfe's use of newly disclosed evidence in support of his existing *Brady* and other claims, Wolfe filed a motion to amend his 28 U.S.C. § 2254 petition. *See* J.A. 4026-27 (arguing that the Commonwealth "has tenaciously fought to deny Wolfe access to any facts that would have enabled him to plead additional *Brady* . . . sub-claims," and thus "should not be rewarded for playing hide-the-ball" and "should not be allowed to blame Wolfe for lacking the clairvoyance to include these proposed amendments to his 2005 federal habeas petition without the benefit of the withheld documents"). By its mid-hearing order of November 12, 2010, the district court granted Wolfe's motion to amend "out of an abundance of caution," but found that "even in the absence of the [motion], the issues [Wolfe] raises fall squarely within the [existing *Brady* claim]." *See Wolfe v. Clarke*, No. 2:05-cv-00432 (E.D. Va. Nov. 12, 2010) (the "Amendment Order").[4]

Thereafter, by its opinion and order of July 26, 2011, the court determined that Wolfe was entitled to habeas corpus relief premised on, inter alia, the Commonwealth's manifold violations of his *Brady* rights. *See Wolfe v. Clarke*, No. 2:05-cv-00432 (E.D. Va. July 26, 2011) (the "*Brady* Order").[5] Specifically, the court ruled in the *Brady* Order that the prosecu-

---

[3]The Discovery Order is found at J.A. 3517.

[4]The Amendment Order is found at J.A. 4059-60.

[5]The *Brady* Order, which amended an earlier decision of July 12, 2011, is found at J.A. 5203-59 and published at 819 F. Supp. 2d 538 (E.D. Va. 2011).

tion had withheld eight items or groups of favorable and material evidence, falling into three broader categories: (1) evidence tending to impeach triggerman Barber; (2) evidence tending to impeach other prosecution witnesses who corroborated Barber's testimony; and (3) evidence suggesting an alternate theory of the Petrole murder. The court also deemed Wolfe to be entitled to relief on his claim that the prosecution knowingly presented false testimony by Barber, in contravention of Wolfe's Fourteenth Amendment due process rights under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972) (the "*Giglio* claim"), as well as his claim that the state trial court deprived him of his rights under the Sixth and Fourteenth Amendments to an impartial jury by striking a qualified venireman for cause (the "venireman claim"). Notably, the court closed its *Brady* Order by specifying that Wolfe's "conviction and sentence" — both in the singular — were vacated. *See Brady* Order 57.

Wolfe timely filed a Federal Rule of Civil Procedure 59(e) motion to alter or amend the judgment, seeking the district court's clarification that the awarded relief encompassed vacatur of not only his murder conviction and death sentence, but also his convictions and sentences for using a firearm in the commission of a felony and conspiring to distribute marijuana. The court granted Wolfe's motion by its order of August 30, 2011. *See Wolfe v. Clarke*, No. 2:05-cv-00432 (E.D. Va. Aug. 30, 2011) (the "Relief Order"). The court clarified therein that, "[i]n light of [its] finding that [Wolfe] was denied the right to due process during his state criminal trial, [he] is entitled to a new trial on all charges previously considered by the state court." Relief Order 1-2. That same day, the judgment was amended to direct the Commonwealth to retry Wolfe within 120 days or release him unconditionally. *See Wolfe v. Clarke*, No. 2:05-cv-00432 (E.D. Va. Aug. 30, 2011) (the "Judgment"). The Judgment was subsequently stayed pending this appeal by the Commonwealth. *See Wolfe v.*

*Clarke*, No. 2:05-cv-00432 (E.D. Va. Nov. 22, 2011) (the "Stay Order").[6]

We possess jurisdiction over the Commonwealth's appeal pursuant to 28 U.S.C. § 1291. Further, because we granted Wolfe a certificate of appealability for a cross-appeal, we have 28 U.S.C. §§ 1291 and 2253(c) jurisdiction to consider his contention that the district court should have granted him relief on an additional, unadjudicated claim: that "[e]ven if the prosecutors had no knowledge of Barber's perjury at the time of trial, they do now," and thus his continuing detention by the Commonwealth "'constitute[s] a due process violation.'" *See* Br. of Appellee 62-63 (quoting *Sanders v. Sullivan*, 863 F.2d 218, 224 (2d Cir. 1988)) (the "*Sanders* claim"); *see also Brady* Order 52 (ruling in favor of Wolfe on his *Giglio*, rather than *Sanders*, claim, premised on the finding that the Commonwealth "presented Barber's trial testimony despite having information in its possession indicating that the testimony was false").

As explained below, we need look no further than one item of the first category of evidence withheld from Wolfe's defense by the prosecution — the evidence tending to impeach Barber — to agree with the district court that Wolfe deserves habeas corpus relief on his *Brady* claim and affirm the Judgment. *See Brady* Order 42 (observing "that the suppressed habeas evidence relating to Barber alone is enough to warrant habeas relief under *Brady*"). Consequently, we need not review any issues of substance or procedure related solely to the other withheld evidence underlying Wolfe's *Brady* claim, or to his *Giglio*, *Sanders*, and venireman claims.

---

[6]The Relief Order is found at J.A. 5293-94, the Judgment at J.A. 5295, and the Stay Order at J.A. 5407-29. The Stay Order is published at 819 F. Supp. 2d 574 (E.D. Va. 2011).

## II.

## A.

The single, plainly momentous item of suppressed Barber impeachment evidence on which we rest today's decision is a written police report reflecting that — before Barber ever asserted that Wolfe hired him to murder Petrole — Prince William County Detective Newsome advised Barber that he could avoid the death penalty by implicating Wolfe. *See* J.A. 4825-27 (the "Newsome report"). The Newsome report documents Newsome's and fellow Detective Walburn's conversations with Barber during an April 14, 2001 cross-country flight, returning Barber to Virginia upon his arrest in California three weeks after the Petrole murder. In pertinent part, the Newsome report reveals the following:

> I told Barber that we knew he had killed Petrole and had a very strong case against him. But that as far as we knew he had no personal problem with Daniel Petrole but that he had killed him for someone else and we believed that person was Justin Wolfe. I explained to him that we needed the information that he had in order to arrest Wolfe. I explained again that we had a very strong case against him (Barber) and that we could stop there but that would not be right since we knew it was someone else [sic] idea. I told him that he was potentially facing a capitol [sic] murder charge in this case and that he needed to help himself. He asked me, "What do I get out of it if I tell you who the other person, the higher up, is". I told him I could not make any promises to him, but that the Commonwealth might entertain the idea of not charging him with Capitol [sic] Murder, or that they may be willing to make a recommendation as to his sentence.

> Again Barber asked about discovery and I again explained it to him. He then said, What do I get out

> it [sic] if I name the "higher up". I told him that was one of his problems; that his case was so tight he really had very little to offer us. I told him it could simply be the difference between Capitol [sic] murder or First Degree, execution or life in prison, or that the Commonwealth may be willing to make a recommendation in sentencing after speaking to his attorney. I told him again that the Commonwealth's Attorney would make these decisions and that I could not promise him anything. I pointed out that at this point he would do more good than harm for himself by cooperating with us.

J.A. 4826-27.

The Commonwealth inexplicably withheld the Newsome report from Wolfe until these 28 U.S.C. § 2254 proceedings in 2010, after Wolfe's first appeal and during the contentious discovery proceedings conducted in the *Wolfe I* remand. Thus, the Newsome report was among the newly disclosed evidence that the Commonwealth argued was outside the legitimate purview of Wolfe's *Brady* claim — a contention that was roundly rejected by the district court in its mid-evidentiary-hearing Amendment Order of November 12, 2010. During the evidentiary hearing, as recounted in the court's subsequent *Brady* Order, "Barber recanted his trial testimony while under oath." *Brady* Order 50. Barber also engaged in the following exchange with the Commonwealth's lawyer during cross-examination:

> Q  You related that several times they had said if you don't tell us what we want, you will get capital murder?
>
> A.  Yeah.
>
> Q.  Who is they?

A.    [Commonwealth's Attorney] Ebert, [Assistant Commonwealth's Attorney] Conway, [Barber's attorney] Pickett, [Detective] Newsome, [and Detective] Walburn.

Q.    But if my notes are correct, they never told you exactly what to say. They didn't give you a script for the events of that night, did they?

A.    A specific script for the events, no.

Q.    They in fact told you what they wanted was the truth, didn't they?

A.    They said that they know Justin [Wolfe] is involved and that we know that he hired you to kill Danny [Petrole].

Q.    Well, what they told you they wanted you to tell them was the truth. Wasn't that their statement?

                    * * *

Wasn't that their statement to you, that they wanted the truth?

A.    Yeah. I mean, they said they wanted the truth, but at the same time they said that this is what you have got to say or you are getting the chair.

J.A. 3751-52. By its *Brady* Order, the district court found the foregoing testimony by Barber to be "consistent with the suppressed [Newsome] report." *See Brady* Order 9 n.9. The court also deemed Barber's recantation to be "credible" and generally found his "demeanor and candor" to be "persuasive." *Id.* at 50.

Among the enumerated findings of fact in the district court's *Brady* Order is the finding (No. 6) that "[t]he prosecu-

tion failed to disclose Detective Newsome's report outlining his initial interview with Owen Barber on April 14, 2001, during which he [Newsome] implicated Wolfe as being involved in the murder before Barber mentioned his [Wolfe's] involvement." *Brady* Order 8. The court also spelled out the controlling legal standard for assessing Wolfe's *Brady* claim, observing that, "to find a *Brady* violation, it must determine that the evidence was 1) favorable to the accused, 2) suppressed by the prosecution (either willfully or inadvertently), and 3) material." *Id.* at 4 (citing *Banks v. Dretke*, 540 U.S. 668, 691 (2004)). In concluding that the emergence of the Newsome report entitled Wolfe to habeas corpus relief, the court explained:

> This information is favorable to Wolfe because it documents the fact that detectives first mentioned Wolfe in connection to the murder and presented Barber with the option of execution or life imprisonment in exchange for implicating someone else, well before Barber began cooperating with the Commonwealth or implicating Wolfe in the murder. Prosecutors do not dispute the fact that the report was not provided to [Wolfe]. Furthermore, the report is material because it reflects that Barber had a motive to misrepresent the facts regarding Petrole's death.

*Id.* at 20.[7]

---

[7]In its *Brady* Order, the district court also assessed the cumulative materiality of the Newsome report and the seven other items or groups of suppressed evidence that it found favorable to Wolfe. *See Brady* Order 37-44. The first category of that evidence — evidence tending to impeach Barber — encompasses the Newsome report, plus evidence that Barber possessed other motives to murder Petrole (the "Barber-Petrole relationship evidence") and that Barber's roommate, Jason Coleman, informed the prosecution that Barber had confessed to acting alone (the "Coleman evidence"). *See id.* at 15-22. The Barber-Petrole relationship evidence includes statements made by confidential informants and Barber's fellow inmates indicating that Barber knew Petrole before the murder, that Barber

## B.

According to the Commonwealth, we should not reach or address the merits of the Newsome report aspect of Wolfe's *Brady* claim, because the Newsome report would never have surfaced or been made available to Wolfe but for the flawed procedural rulings made by the district court in the *Wolfe I*

---

owed Petrole money, that Petrole "had a hit out" on Barber, and that Barber had a close relationship with Petrole's roommate. *See id.* at 15-19. The Coleman evidence revealed that Coleman "had a conversation with Barber after the murder where Barber admitted to [Coleman] that he murdered Petrole and acted alone," and that Coleman reported that conversation to the prosecution, including the Commonwealth's Attorney. *Id.* at 20.

The second category of suppressed evidence — evidence tending to impeach other prosecution witnesses who corroborated Barber's testimony — includes information relating to a deal the Commonwealth made with its witness J.R. Martin in exchange for his cooperation (the "Martin evidence"), as well as a recorded statement made by the Commonwealth's witness Jason Hough in conflict with his subsequent trial testimony regarding his pre-Petrole-murder conversation with Wolfe and Coleman about robbing drug dealers (the "Hough evidence"). *See Brady* Order 22-28. Finally, the third category of withheld evidence — evidence suggesting an alternate theory of the Petrole murder — consists of the following: various reports and witness statements relating to a parallel drug investigation that indicated conflict in Petrole's drug business unrelated to Wolfe's purported motive for having Petrole murdered (the "drug investigation evidence"); evidence that Petrole was rumored to be a government informant, constituting yet another possible motive for his murder (the "informant evidence"); and the statements of three witnesses that they saw a second car at the crime scene shortly after the Petrole murder (the "second car evidence"). *See id.* at 28-36.

Having assessed the materiality of the foregoing — the Newsome report, the Barber-Petrole relationship evidence, the Coleman evidence, the Martin evidence, the Hough evidence, the drug investigation evidence, the informant evidence, and the second car evidence — the district court concluded that the evidence's suppression by the prosecution was, by category and cumulatively, patently prejudicial. While we look no further than the Newsome report today, we do not condone the prosecution's apparent suppression of other *Brady* material and the pattern of conduct that it reveals.

remand proceedings. In that regard, the Commonwealth asserts that the court erred in three respects: by generally excusing Wolfe's procedural defaults under the *Schlup* actual innocence standard; by authorizing discovery and conducting the evidentiary hearing; and by allowing Wolfe to amend his 28 U.S.C. § 2254 petition to broaden his *Brady* claim to include the Newsome report and other newly disclosed evidence. We examine those assertions in turn.

1.

Attacking the *Schlup* Order, the Commonwealth argues that the district court erred by ruling early in the remand proceedings that Wolfe satisfied the *Schlup* actual innocence standard on the basis of the *Wolfe I* record, including the 2005 affidavit in which Barber recanted his trial testimony and denied Wolfe's involvement in the Petrole murder. The Commonwealth emphasizes that the court, in looking at that same record, had already decided that the Barber affidavit lacked credibility. *See* Br. of Appellant 47 ("The court never explained its about face and the record certainly did not justify any finding of 'innocence' under *Schlup* . . . ."). Wolfe, of course, defends the *Schlup* Order, asserting that "the correctness of the district court's findings was confirmed when Barber recanted his trial testimony while under oath at the [post-*Schlup* Order] evidentiary hearing." *See* Br. of Appellee 19-20 (internal quotation marks omitted); *see also Brady* Order 50 (finding Barber's evidentiary hearing recantation "credible" and his "demeanor and candor persuasive").

In any event, we need not reach or assess the parties' competing contentions on the validity of the *Schlup* Order. Put simply, any procedural default of Wolfe's *Brady* claim — particularly as it relates to the Newsome report — was otherwise excused under the separate "cause and prejudice" standard. As we explained in *Wolfe I*,

> [a] procedural default is excusable under the cause
> and prejudice standard when the petitioner demon-

strates (1) "that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," *Murray v. Carrier*, 477 U.S. 478, 488 (1986), and (2) that "errors at his trial . . . worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions," *United States v. Frady*, 456 U.S. 152, 170 (1982).

*Wolfe I*, 565 F.3d at 158 n.27 (alteration in original). On remand, after having decided the *Schlup* issue in Wolfe's favor, the district court understandably declined our *Wolfe I* invitation to revisit its prior cause and prejudice ruling. *See id.* at 165 n.35. Nevertheless, pursuant to Supreme Court precedent, the district court necessarily found cause and prejudice for the *Brady* claim's default when it determined that claim to be meritorious. *See Banks*, 540 U.S. at 691 (recognizing that "'[c]ause and prejudice' . . . 'parallel two of the three components of the alleged *Brady* violation itself'" (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999))).

To illustrate, as recognized by the district court, "the three components or essential elements of a *Brady* prosecutorial misconduct claim" are the following: "'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Banks*, 540 U.S. at 691 (quoting *Strickler*, 527 U.S. at 281-82). By satisfying "the second *Brady* component (evidence suppressed by the State), a petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence." *Id.* Additionally, "coincident with the third *Brady* component (prejudice), prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes." *Id.*

Thus, by "succeed[ing] in establishing the elements of his [*Brady*] claim" — which we today affirm that he did — Wolfe concurrently "succeed[ed] in demonstrating 'cause and prejudice' [for his procedural default of that claim]." *See Banks*, 540 U.S. at 691. By these circumstances, the Commonwealth's challenge to the *Schlup* Order is rendered moot.

2.

Next, the Commonwealth asserts the district court erred in the remand proceedings by authorizing discovery and conducting the evidentiary hearing. In rejecting the Commonwealth's position, we emphasize that the court faithfully followed our *Wolfe I* directions to "re-examine whether Wolfe has shown that he is entitled to [an evidentiary hearing]," and then, "[i]f such a hearing is warranted," to "resolve any factual disputes bearing on the procedural *Schlup* issue and the substantive *Brady* and *Giglio* claims." *See Wolfe I*, 565 F.3d at 170-71. We also observe that *Wolfe I* pragmatically anticipated that discovery would be conducted in conjunction with any evidentiary hearing. *See id.* at 171 n.44 (advising that, "[i]f the court determines that *Schlup* is satisfied on the existing record, *any evidentiary hearing and discovery proceedings* may relate primarily to the merits of Wolfe's substantive claims" (emphasis added)). We therefore conclude that, in authorizing discovery and conducting the evidentiary hearing, the district court acted well within its discretion. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (recognizing that "the decision to grant an evidentiary hearing [in a 28 U.S.C. § 2254 case is] generally left to the sound discretion of the district courts"); *see also Conaway v. Polk*, 453 F.3d 567, 582 (4th Cir. 2006) (relating that district court's decision on whether to conduct evidentiary hearing or authorize discovery proceedings is reviewed for abuse of discretion).

Briefly, as we more thoroughly explained in *Wolfe I*, 565 F.3d at 166-71, if a § 2254 petitioner "has failed to develop the factual basis of a claim in State court proceedings,"

§ 2254(e)(2) bars a district court from conducting an evidentiary hearing on the claim unless the petitioner can satisfy one of two statutory exceptions. Importantly, however, "'a failure to develop the factual basis of a claim is not established unless there is *lack of diligence*, or some greater fault, attributable to the prisoner or the prisoner's counsel.'" *Wolfe I*, 565 F.3d at 167 (quoting *Williams (Michael) v. Taylor*, 529 U.S. 420, 432 (2000)); *see also Cullen v. Pinholster*, 131 S. Ct. 1388, 1401 (2011) (recently affirming that § 2254(e)(2) "continues to have force," in that it "still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court" (citing *Michael Williams*, 529 U.S. at 427-29)).

Applying the controlling standard on remand, the district court determined that § 2254(e)(2) did "not bar [Wolfe] from an evidentiary hearing." *See Schlup* Order 11. In so ruling, the court observed that Wolfe had made diligent efforts in the state court proceedings to develop his *Brady* claim by "request[ing] a hearing," "fil[ing] requests under the Virginia Freedom of Information Act," and "mov[ing] for discovery on multiple occasions." *Id.* at 10. Moreover, with respect to the exculpatory 2005 Barber affidavit on which Wolfe's federal habeas petition largely relied, the court found that "[t]here [was] no indication that Barber would have been willing to give his affidavit at an earlier time, particularly as [Wolfe's] lawyers had repeatedly attempted to get Barber to make a statement and he had refused." *Id.* at 11. The court thus concluded that Barber's prior reticence was "precisely the type of external cause that . . . excuses a failure to fully develop facts in state court." *Id.* (citing *Conaway*, 453 F.3d at 589 (explaining that, because petitioner had "been reasonably diligent in pursuing his claim, and his failure to fully develop the facts related to [his] claim in state court is attributable to external causes, § 2254(e)(2) does not preclude him from being accorded an evidentiary hearing in federal court")).

Having decided that Wolfe was eligible to be accorded an evidentiary hearing, the district court then turned to the ques-

tion of whether he was entitled to one. That inquiry required the court to determine "'if the facts alleged would entitle [Wolfe] to relief, and if he satisfie[d] one of the six factors enumerated by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 313 (1963).'" *See Wolfe I*, 565 F.3d at 169 (quoting *Conaway*, 453 F.3d at 582). Properly "evaluat[ing Wolfe's petition] pursuant to the principles of Federal Rule of Civil Procedure 12(b)(6)," *see id.*, the court concluded that Wolfe set forth sufficient facts to state meritorious *Brady* and *Giglio* claims. *See Schlup* Order 12 (observing that Wolfe "alleged serious violations of his rights," and that those "allegations [were] made even without the benefit of discovery that could lead to considerable additional exculpatory material"). The court also ruled that Wolfe "met at least three of the six [*Townsend*] factors," in that "'the merits of the factual dispute were not resolved in the state hearing'" (factor 1); "'there is a substantial allegation of newly discovered evidence'" (factor 4); and "'the material facts were not adequately developed at the state-court hearing'" (factor 5). *Id.* at 12 (quoting *Townsend*, 372 U.S. at 313); *see also Wolfe I*, 565 F.3d at 313 (observing that factors 1, 4, and 5 "appear to be applicable here"). Accordingly, the court granted Wolfe's request for an evidentiary hearing, as well as his motion for predicate discovery.

Far from abusing its discretion, the district court engaged in a sound assessment of the evidentiary hearing issue. Premised on that analysis, the court also appropriately (if not explicitly) found that Wolfe had demonstrated "good cause" for discovery. *See Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998) ("Good cause is shown if the petitioner makes a specific allegation that shows reason to believe that the petitioner may be able to demonstrate that he is entitled to relief."). As a result of the foregoing, Wolfe properly obtained new and relevant evidence, including the Newsome report, in the remand proceedings.

3.

The Commonwealth nevertheless persists in its efforts to thwart Wolfe's reliance on the Newsome report and other newly disclosed evidence, asserting on appeal that Wolfe was erroneously allowed to amend the *Brady* claim alleged in his 2005 federal habeas petition. *See* Br. of Appellant 43 (accusing the district court of "an abuse of judicial power"). The Commonwealth's weak — though strident — contentions in that respect do not long detain us. First of all, we agree with the district court that an amendment of Wolfe's § 2254 petition was not necessary, because his new evidence-related issues "fall squarely within the [existing *Brady* claim]." Amendment Order 2 (specifying that Wolfe's motion to amend was granted "merely out of an abundance of caution"); *see also* J.A. 2854 (Wolfe's 2005 federal habeas petition, broadly alleging that the Commonwealth violated his *Brady* rights by suppressing, inter alia, "[e]xculpatory and impeachment evidence related to the Commonwealth's key witness, Owen Barber").

Furthermore, we reject the Commonwealth's unfounded depiction of "last-minute amendments far beyond the scope of remand [in violation of] the 'mandate rule.'" *See* Br. of Appellant 43. To the contrary, our *Wolfe I* mandate explicitly authorized the district court to conduct "such other and further proceedings as may be appropriate." *See* 565 F.3d at 171. In any event, it is difficult to take seriously the Commonwealth's protestations of unfair ambush, when Wolfe had to labor for years from death row to obtain evidence that had been tenaciously concealed by the Commonwealth, and that the prosecution obviously should have disclosed prior to Wolfe's capital murder trial.

C.

With Wolfe's procedural hurdles behind us, we proceed to consider the substance of his *Brady* claim. Because we focus

on an aspect of that claim — the long-concealed Newsome report — that was not adjudicated in the state court proceedings, we owe no 28 U.S.C. § 2254(d) deference to any state decision. *See Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir. 2003) ("[Section 2254(d)'s] deference requirement does not apply when a claim made on federal habeas review is premised on *Brady* material that has surfaced for the first time during federal proceedings."); *see also Winston v. Pearson*, 683 F.3d 489 (4th Cir. 2012). Rather, we review the district court's "legal conclusions de novo and findings of fact for clear error." *Monroe*, 323 F.3d at 299.

1.

As previously explained, to succeed on his *Brady* claim, Wolfe is first required to show that the Newsome report is "favorable to [him], either because it is exculpatory, or because it is impeaching." *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) (internal quotation marks omitted). The Newsome report is indubitably impeaching, in that it establishes a motive not only for Barber to implicate someone else, but to point the finger specifically at Wolfe. Indeed, it cannot be trivialized that — as Detective Newsome's own report demonstrates — Newsome fed Barber the crux of his testimony, i.e., that he was hired by Wolfe to murder Petrole. Put simply, the Newsome report is crucial, impeaching evidence that was "unquestionably subject to disclosure under *Brady*." *See Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 556 (4th Cir. 1999).

2.

Wolfe next must establish that the Newsome report was "suppressed by the State, either willfully or inadvertently." *See Banks*, 540 U.S. at 691 (internal quotation marks omitted). The Commonwealth did not contest the suppression issue in the district court proceedings, and does not do so in this appeal. Because the Commonwealth concedes that it

withheld the Newsome report, and because the willfulness or inadvertence of its transgression is inconsequential to our *Brady* analysis, we could say no more on the issue. Nevertheless, we feel compelled to acknowledge that the Commonwealth's suppression of the Newsome report, as well as other apparent *Brady* materials, was entirely intentional.

During Wolfe's evidentiary hearing in the district court, the Commonwealth's Attorney explained that his office does not have an "open-file policy," providing criminal defense counsel access to entire case files. *See* J.A. 3690. Asked to elaborate, he offered the flabbergasting explanation that he has "found in the past when you have information that is given to certain counsel and certain defendants, they are able to fabricate a defense around what is provided." *Id.* Additionally, the Assistant Commonwealth's Attorney admitted that he does not produce evidence to a criminal defendant unless he first deems it to be "material[ ]" and "credib[le]." *Id.* at 3782. The district court rightly lambasted that conduct in its *Brady* Order:

> In effect, Ebert admits here that his contempt of defendants who "fabricate a defense" guides his perspective on disclosing information. This is particularly troubling in the case at bar where the record is replete with statements from Ebert and Conway regarding the scrutiny and credibility determinations that they made (as opposed to the jury) regarding the relevance of any potential exculpatory evidence. Essentially, in an effort to ensure that no defense would be "fabricated," Ebert and Conway's actions served to deprive Wolfe of any substantive defense in a case where his life would rest on the jury's verdict. The Court finds these actions not only unconstitutional in regards to due process, but abhorrent to the judicial process.

*Brady* Order 43 n.24; *see also Muhammad v. Kelly*, 575 F.3d 359, 370 (4th Cir. 2009) (refusing to condone the suppression

of evidence by the Prince William County prosecutors, and advising them to "err on the side of disclosure, especially when a defendant is facing the specter of execution"). We sincerely hope that the Commonwealth's Attorney and his assistants have finally taken heed of those rebukes.

3.

Of course, Wolfe is yet ineligible for § 2254 relief on his *Brady* claim unless he makes a third showing — that "prejudice . . . ensued" from the Commonwealth's suppression of the Newsome report. *See Banks*, 540 U.S. at 691 (internal quotation marks omitted). The prejudice inquiry requires us to determine if the Newsome report is "material" to Wolfe's guilt, i.e., whether "there is a reasonable probability that, had the [Newsome report] been disclosed, the result of the [trial] would have been different." *See Cone v. Bell*, 556 U.S. 449, 469-70 (2009). Importantly, a reasonable probability does not mean that Wolfe "would more likely than not have received a different verdict with the [Newsome report]," only that the likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the trial." *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted).

The Commonwealth principally contends that the Newsome report and other Barber impeachment evidence were immaterial, because even without Barber's testimony that Wolfe hired him to murder Petrole, there was overwhelming trial evidence of Wolfe's guilt. Concomitantly, the Commonwealth asserts that the district court ignored important pieces of non-Barber evidence, and thus improperly failed to weigh them in the *Brady* Order materiality analysis. The Commonwealth's argument is belied by the *Brady* Order, which carefully outlined the trial evidence and came to the inevitable conclusion that "Owen Barber's testimony was the only evidence that the Prosecution presented to prove that [Wolfe] hired Barber to kill Petrole." *Brady* Order 41. Upon our own

review of the trial record in the *Wolfe I* appeal, we also grasped that "Barber was the prosecution's key witness in Wolfe's capital trial and the only witness to provide any direct evidence regarding the 'for hire' element of the murder offense and the involvement of Wolfe therein." *Wolfe I*, 565 F.3d at 144. And, the Commonwealth itself conceded at Barber's sentencing hearing on his non-capital murder conviction — where he received a sentence of just sixty years in prison, with twenty-two years suspended — that "but for [Barber's] testimony Mr. Wolf[e] probably would not have been prosecuted." J.A. 5144.

In these circumstances, where "the jury had to believe that Barber was credible and that his version of events was in fact truthful and accurate in order to support [Wolfe's] conviction," *Brady* Order 41, the materiality of the Newsome report is manifest. *See Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (holding that, where an eyewitness's "testimony was the *only* evidence linking [the defendant] to the crime," the eyewitness's undisclosed prior inconsistent statements "were plainly material"); *Harris v. Lafler*, 553 F.3d 1028, 1034 (6th Cir. 2009) ("Considerable authority from the Supreme Court and our court indicates that a defendant suffers prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness."); *Monroe*, 323 F.3d at 315-16 (explaining that, because a witness's testimony was "crucial" to proving premeditation, there was "a reasonable probability that [the defendant] would not have been convicted of first-degree murder" if evidence tending to impeach the witness had been properly disclosed). Wolfe therefore satisfies the third and final element of his *Brady* claim.[8]

---

[8]We are not convinced otherwise by the Commonwealth's attempt to portray the Newsome report as immaterial because "the jury knew the far more impeaching fact that Barber had . . . avoided the death penalty in return for his testimony." *See* Br. of Appellant 22. Evidence that Barber got a deal for implicating Wolfe is hardly "more impeaching" than the

## D.

Having confirmed that Wolfe is entitled to 28 U.S.C. § 2254 relief, the only remaining issue before us is whether the district court properly vacated all three of Wolfe's convictions, including his conviction for conspiring to distribute marijuana, for which he received the statutory maximum sentence of thirty years. *See* Relief Order 1 (deeming full vacatur appropriate because the Commonwealth's "*Brady* and *Giglio* violations . . . permeated the fairness of [Wolfe's] trial on all charges"). In contesting the court's vacatur decision, the Commonwealth criticizes the court's reliance on Federal Rule of Civil Procedure 59(e) to amend the Judgment. Unfortunately for the Commonwealth, the court acted well within its discretion. *See Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 407 (4th Cir. 2010) (explaining that "a court may alter or amend the judgment if the movant shows[, inter alia,] that there has been a clear error of law or a manifest injustice," subject to review "under the deferential abuse of discretion standard").

The Commonwealth further asserts that the district court improperly vacated Wolfe's drug conspiracy conviction because it was unaffected by the suppression of any *Brady* material. Significantly, it is the Commonwealth's position that the drug conviction and attendant thirty-year sentence were secured on the basis of Wolfe's trial testimony, wherein he "not only admitted to drug dealing, but bragged about dealing on a massive scale." *See* Br. of Appellant 57 (contending that, in light of Wolfe's self-incriminating testimony, "[t]here was

---

Newsome report evidence that Detective Newsome specified Wolfe as the deal-garnering perpetrator. Moreover, contrary to the Commonwealth's suggestion that Barber denied being influenced by prosecutors and police to name Wolfe, *see id.*, Barber testified in the district court's evidentiary hearing that "they said they wanted the truth, but at the same time they said that this is what you have got to say or you are getting the chair," J.A. 3752.

no likelihood, much less a reasonable one, that Wolfe would not have been convicted of conspiracy to distribute marijuana had the allegedly withheld evidence about Wolfe's part in the *murder* been disclosed"). The Commonwealth emphasizes that "Wolfe's unrepentant braggadocio was the focus of the Commonwealth's closing arguments" and "justified the Commonwealth's call for the maximum sentence." *Id.* Indeed, although the Commonwealth refers in its opening brief to "overwhelming evidence of a far-reaching drug conspiracy," *id.* at 58, the only evidence discussed therein with any specificity is Wolfe's own damning testimony.

In response, Wolfe maintains that, in the absence of the Newsome report and other wrongfully suppressed Barber impeachment evidence, "his only option was to take the stand and stake his word against Barber's — an unattractive option, for as the Commonwealth acknowledges[,] it required Wolfe to admit to committing a felony and risk thirty years' imprisonment." Br. of Appellee 72. According to Wolfe,

> [his] lawyer would have had little reason to put [Wolfe] on the stand if he could have put forth another, more credible defense theory. Instead, Wolfe's admission of guilt *became* his defense: In closing, Wolfe's counsel called the jury's attention to Wolfe's admission of guilt on the drug charges to contrast it with his protestations of innocence of murder. The Commonwealth's drug prosecution thus benefited enormously from its systematic suppression of *Brady* evidence.

*Id.* at 72-73 (citations, alteration, and internal quotation marks omitted).

We are entirely convinced by Wolfe's contentions. Because the Commonwealth concedes that Wolfe's trial testimony was central to his drug conspiracy conviction and sentence, and because the Commonwealth cannot prove that Wolfe would

have testified if the Newsome report had not been suppressed, we agree with the district court that Wolfe is entitled to vacatur of all three of his state convictions. *Cf. United States v. Pelullo*, 105 F.3d 117, 125 (3d Cir. 1997) (concluding that, where the government committed *Brady* violations that allegedly adduced the defendant's trial testimony, that testimony could not be used against the defendant at a subsequent trial unless the government could prove that "the defendant would have testified anyway even if there had been no constitutional violation" (citing *Harrison v. United States*, 392 U.S. 219, 225 (1968) ("Having 'released the spring' by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony."))). Of course, as the district court's Judgment reflects, the Commonwealth is free to retry Wolfe on the murder, firearm, and drug conspiracy charges.[9]

---

[9]We are unwilling to mine the trial record, as our distinguished colleague urges, to identify evidence, aside from Wolfe's testimony, that might sustain his drug conspiracy conviction. The Commonwealth itself has abstained from any such endeavor. *See post* at 30 (acknowledging that "the Commonwealth did not, in its argument, greatly aid in our analysis"). Moreover, whatever evidence exists is inevitably tainted by the prosecutorial misconduct in this case. By depriving Wolfe of the Newsome report, for example, the Commonwealth not only induced Wolfe to take the witness stand to gainsay Barber's trial story, but compelled the defense to abandon its challenge to the alleged drug conspiracy in order to defend against the death penalty offense of murder-for-hire. With the Newsome report in hand, Wolfe could readily have impeached Barber — as well as, by extension, the evidence corroborating Barber's murder-for-hire story and implicating Wolfe in drug dealing — with compelling evidence that the murder-for-hire story had been planted with Barber by Detective Newsome. As such, the conduct of the prosecution in concealing the Newsome report undermines confidence in the fairness and propriety of the entire trial, including the drug conspiracy conviction, rendering that misconduct a sufficient independent basis for vacating each of Wolfe's convictions and for ordering his unconditional release or retrial.

### III.

Pursuant to the foregoing, we affirm the Judgment of the district court.

*AFFIRMED*

DUNCAN, Circuit Judge, dissenting in part:

I write with regard and appreciation for the majority's disposition of Wolfe's murder-for-hire and firearm convictions. I must, however, respectfully and narrowly dissent from its granting of habeas relief on the drug conspiracy conviction. The record, and, significantly, the majority does not directly refute it, contains ample evidence from sources other than Wolfe's testimony to support the drug conviction. The district court's Relief Order does not address the merits of the drug conspiracy issue at all, and the case on which it purports to rely is inapposite as to that charge. *See Wolfe v. Clarke*, No. 1:05-cv-00432 (E.D. Va. Aug. 30, 2011) (citing *Monroe v. Angelone*, 323 F.3d 286, 293 n.5 (4th Cir. 2003)).*

I fully recognize and appreciate the focus of the district court and the majority on the more serious charges. And, indeed, the Commonwealth did not, in its argument, greatly aid our analysis. The Commonwealth's behavior here is far from exemplary. But the Newsome report cannot carry the weight the majority would assign to it. Because of the amount of evidence as to the drug conspiracy untainted by the *Brady*

---

*In *Monroe*, we granted habeas relief to a petitioner charged, as Wolfe is here, with murder and the use of a firearm in the commission of a felony because we agreed with the district court's determination that the Commonwealth of Virginia had committed *Brady* violations. Unlike in *Monroe*, however, Wolfe is also charged with a drug conspiracy, and nothing in *Monroe* suggests habeas relief is also appropriate for a free-standing charge supported by considerable evidence free of any Constitutional infirmity.

violation, I would at the very least remand that conviction to the district court for *its* specific consideration.