**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-6518

CHARLES RAY FINCH,

Petitioner – Appellant,

v.

SUPERINTENDENT TIMOTHY MCKOY,

Respondent – Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Dever III, District Judge. (5:15-hc-02302-D)

Argued: November 15, 2018                    Decided: January 25, 2019

Before GREGORY, Chief Judge, KEENAN, and FLOYD, Circuit Judges.

Reversed and remanded by published opinion. Chief Judge Gregory authored the opinion, in which Judge Keenan and Judge Floyd joined.

**ARGUED:** James Earl Coleman, Jr., DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina, for Appellant. Nicholaos G. Vlahos, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Nita A. Farahany, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina, for Appellant. Joshua H. Stein, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NORTH CAROLINA, Raleigh, North Carolina, for Appellee.

GREGORY, Chief Judge:

Petitioner Charles Ray Finch appeals the denial of his federal habeas petition. In 1976, a jury in Wilson, North Carolina convicted Finch of first-degree murder. Finch originally received a death sentence, but in 1977, the North Carolina Supreme Court commuted his sentence to life imprisonment. In 2015, Finch filed a habeas petition in the United States District Court for the Eastern District of North Carolina. The district court denied Finch's petition. Because the present record meets the exacting standard for the actual innocence gateway to consideration of a constitutional claim, we reverse the district court's decision and remand the petition for adjudication on the merits.

## I.

In the years after his 1976 conviction, Finch filed various *pro se* and counseled motions for relief with North Carolina state courts but received orders denying all of them. On December 17, 2015, Finch filed a federal habeas petition in the United States District Court for the Eastern District of North Carolina. The State moved for summary judgment on August 1, 2016 on multiple grounds, including on the basis that Finch's claims were time barred. Without reaching the merits of the habeas petition, the district court granted the State's motion for summary judgment based on untimeliness and dismissed the petition as timed barred. The district court also found that Finch did not meet the actual innocence standard required to overcome his untimeliness. Finch filed a notice of appeal on April 14, 2017. On May 1, 2018, we granted a certificate of

2

appealability.  We have jurisdiction under 28 U.S.C. § 2253(c) on the claim of actual innocence.

## II.

This Court reviews *de novo* a district court's denial of a 28 U.S.C. § 2254 petition filed by a state prisoner.  *MacDonald v. Moose*, 710 F.3d 154, 159 (4th Cir. 2013).  The district court dismissed Finch's petition as untimely because, under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a state prisoner normally has one year to file a federal petition for habeas corpus, beginning at the date that a "judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  *McQuiggin v. Perkins*, 569 U.S. 383, 388 (2013).  The record reflects that all of Finch's claims are untimely.  However, Finch alleges actual innocence, which, if proven, serves as a gateway through which a habeas petitioner may pass when AEDPA's statute of limitations has expired.  *See McQuiggin*, 569 U.S. at 386; *see also Schlup v. Delo*, 513 U.S. 298, 329 (1995).  "This rule, or fundamental miscarriage of justice exception, is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons."  *McQuiggin*, 569 U.S. at 392 (internal quotation marks omitted).

## III.

In order to properly examine Finch's claims of actual innocence, we must first turn to the evidence and testimony considered at the 1976 trial.  The State proffered one eyewitness, Lester Floyd Jones, as the bedrock of its case.  Jones worked for the murder

3

victim, Richard Linwood Holloman, at a grocery store and gas station Holloman owned. Jones testified that he was with Holloman at the store on February 13, 1976, the night of the murder. Jones testified that around 9:00 p.m. he and Holloman were at the store and in the process of locking up for the night. Holloman turned off the store's interior lights, collected the cash from the register, and placed a padlock on the exterior of the front door. During this time, Jones said he heard three male voices coming from the direction of the highway and observed three black men approaching the station. Jones testified that two of them approached Holloman and Jones and one remained back, outside of the store lights' illumination.

Jones described one of the men as wearing a long, three-quarter-length coat, a woman's light-colored stocking on his hair, dark pants, and a light shirt. Jones later identified this man as Finch. Jones described the other man that approached him and Holloman as wearing a red and white checkered shirt, dark pants, and a red toboggan. The man in the checkered shirt asked Holloman if he could buy some alka seltzer and Holloman obliged. Holloman reopened the front door as Jones and the two black males waited outside. Holloman opened the door with his left hand while holding a chrome-plated .32 revolver in his other hand in plain view. Jones testified that the interior lights were turned off but that lights from outside the store shone in through large windows and provided illumination.

Once inside, Holloman asked one of the men if he would like a cup, so he could take his alka seltzer. The man replied, "Yes, sir." Jones testified that Finch chimed in and said, "And your money, too." Holloman said, "Money hell," and Finch said, "I said

4

your damn money, too" and removed a sawed-off shotgun from under his coat and fired at Holloman. Holloman returned fire at Finch with his chrome-plated .32 revolver. After the first shot, Jones dove under a counter and hid there but recalled that Finch faced Holloman during the shootout. Jones testified that he heard a shotgun and that he knew how to distinguish between the sound emitted from a shotgun and the sound emitted from a pistol. Jones recalled hearing three shots. Jones testified that he heard the shooting stop, the door to the shop slam shut, and Holloman calling out to him to call the police. Jones testified the entire episode lasted around five minutes. Holloman succumbed to his injuries.

Jones testified at trial that he recognized Finch as one of Holloman's customers whom he served a few days prior to Holloman's murder. When law enforcement arrived on the night of the crime, a patrolman asked Jones to provide a written statement regarding what he witnessed. Jones wrote what he observed generally and stated he saw three black males and a sawed-off shotgun and used descriptors such as "checkered shirt tobebogging[sic]." Jones did not mention any of the suspects having beards.

Chief Deputy Tony Owens, one of the lead law enforcement officers on the Holloman case, interviewed Jones the night of the murder. Deputy Owens testified that Jones described a black man in a checkered shirt, about 28-30 years old, around 5 feet 7-8 inches tall, weighing around 150-170 pounds, with a light complexion, a thin mustache, and kinky hair. He was wearing a red-and-white toboggan, a red-and-white checkered shirt with long sleeves and dark pants. According to Deputy Owens, Jones said he did not get a really good look at the second man but described the man as a black male,

around 35 years old, about 5 feet 9 inches to 6 feet tall, weighing between 150 and 165 pounds, with a dark complexion and wearing a light-colored stocking as a hat, dark pants and a dark three-quarter-length coat.

In addition to the eyewitness testimony of Jones and Deputy Owens's corroboration, there was evidence of a pretrial line-up. Deputy Owens called Jones into the Wilson County Jail on February 14, 1976, and asked Jones to assist him in identifying the suspect in a line-up. Finch and another suspect, Charles Lewis, were placed into a series of three line-ups at the Wilson County Jail that same night. Finch was wearing a three-quarter-length leather coat and a hat at the time of his arrest. Police lined up seven black males around the same age wearing casual clothes and stood them against a wall. The black males held signs with numbers on them. Finch and Lewis both had beards at the time of the line-up.

Jones selected Finch three times as the murderer in separate but consecutive line-ups. Jones identified Finch as numbers 4, 5, and 2 of the line-ups respectively. Jones did not identify Lewis in any of the three line-ups despite his presence in the red-and-white checkered shirt with long sleeves that matched Jones's earlier description of a suspect. Deputy Owens alleged that he took Finch's jacket and hat and put it on another man in the line-up. The record demonstrates that in all three line-ups Finch had on the same three-quarter length jacket. Finch was the only one wearing a hat in one of the line-ups.

In addition to the line-ups, the State had a witness named Noble Harris provide testimony implicating Finch. Law enforcement interviewed Harris,* a frequent visitor to Holloman's store who lived about a mile from the store and went to the store around twilight the night of Holloman's murder. Harris purchased a beer and a quart of wine. Harris mentioned he wanted to avoid inebriation because he had to work the next day. Holloman explained he had a party and would be closing the shop soon. As Harris left the gas station, he noticed Finch getting out of a blue Cadillac; they greeted each other from afar, and Harris went home. Harris testified he saw other people in the car, but they did not leave the vehicle. A few hours later, after receiving news of the murder, Harris returned to the store around 10:00 p.m. Harris gave a statement to Deputy Owens about seeing Finch at the store earlier that evening.

The State also provided physical and medical evidence during the 1976 proceedings implicating Finch. Law enforcement searched Holloman's store and found various bullet fragments and gun discharges. They also discovered Holloman's gun containing only one spent bullet and all the remaining rounds which were lead bullets. Police in North Carolina arrested Finch the same night that Holloman was killed. Police apprehended Finch and his passenger Charles Lewis as they rode around in Finch's blue Cadillac on Nash Street in Wilson. Finch consented to a police search of his blue Cadillac after his arrest. Law enforcement personnel found a "W W No. 1. Buck" shotgun shell in the left rear door ash tray. At trial, Dr. Henry Haberyan, the State's

---

* Jones also testified that Harris was at the store earlier that evening.

7

forensic pathologist, provided testimony that Holloman died from two shotgun wounds. The doctor used the term "slug" to describe the shotgun bullets. The doctor had also listed in his initial report that it was a wound resulting from a shotgun.

At trial, there was also evidence presented by Finch that provided doubt regarding the eyewitness testimony implicating him. For instance, Jones's former coworker, Bobby Taylor, testified that a week after Holloman's murder, Jones told him that he only thought that Finch was the one who killed Holloman. Moreover, Jones asked Taylor to describe Finch's appearance. Taylor stated that Jones had cognitive issues, struggled with alcoholism, and had issues with short-term memory recall. In addition, three witnesses, Mr. McEachin, Mr. Artis, and Mr. Spells, each testified that Finch could not have shot Holloman because he was playing a poker game at Tom Smith's Shoeshine Parlor in downtown Wilson with them on February 13, 1976, around the same time that Holloman was murdered. Mr. McEachin mentioned that Finch left the poker game for a few hours to run a couple of errands for him. Nonetheless, Mr. McEachin, Mr. Artis, and Mr. Spells all testified that Finch was in their presence at the Shoeshine Parlor at the time of Holloman's murder.

Evidence was proffered to call into question the physical evidence introduced at trial as well. Finch's son Taylor testified that his father had purchased a used car, the blue Cadillac, four months prior to Holloman's murder. Taylor testified that he was cleaning out his dad's car prior to the murder and found the shotgun shell under the seat and placed it into the glove compartment.

On this evidence, the jury found Finch guilty of first-degree murder.

## IV.

This Court must also take into consideration new evidence proffered since the 1976 trial that has a bearing on Finch's actual innocence. First, Finch has offered evidence that casts doubt on the eyewitness testimony dating back to the original proceeding, but that was only revealed years afterwards. For instance, in 2003, Noble Harris provided an updated affidavit, in which he expressed doubts that he saw Finch outside of the store the night of Holloman's murder and that it was only a brief encounter. He stated that he relayed his uncertainty to Deputy Owens when he returned to the store after Holloman's murder that night. Harris recounted in the affidavit that Deputy Owens and the prosecutor pressured him into sticking to his original story implicating Finch. He asserted that the prosecutor and Deputy Owens took him into a little room in the courthouse and asked him repeatedly if he saw Finch that night. According to Harris, the prosecutor and Deputy Owens also told him that Jones was going to testify that Harris was at the store when the murder happened. Harris replied that Jones was "going to testify to a lie."

In addition, in 2013, Deputy Owens testified at Finch's post-conviction hearing. He said an informant told him Finch and two others were planning on robbing a convenience store in Wilson County. He admitted that armed robbery was not consistent with Finch's background but nonetheless, he still had Finch in mind even before he had arrived at Holloman's store.

In 2013, there was also evidence casting doubt on the physical evidence offered at trial. For instance, Dr. John D. Butts, North Carolina's Chief Medical Examiner,

9

clarified that the term "slug" in Dr. Haberyan's letter generally referred to bullets and not only bullets coming from a shotgun. Dr. Haberyan submitted a 2002 letter where he stated that the autopsy report should have used the term "gunshot wounds" instead of "shotgun wounds." Dr. Butts' stated that based on Dr. Haberyan's report it is unlikely that a shotgun created the effects on Holloman's body as observed through the autopsy. Additionally, in 2013, Special Agent Peter Ware, the forensic scientist manager in charge of the firearm toolmark section of the North Carolina State Crime Laboratory, provided testimony that the bullet found at the crime scene, which was presented at trial, and the shell found in Finch's blue Cadillac did not come from the same firearm.

Finally, new expert evidence proffered in 2013 called into question Finch's culpability based on an unduly suggestive pretrial line-up. Brian Cutler, an expert on eyewitness identification from the University of Ontario Institute of Technology, testified on behalf of Finch. Dr. Cutler has multiple advanced degrees in psychology. He specializes in social psychology, forensic psychology, and specifically, the psychology of social influence and eyewitness memory. The court admitted Dr. Cutler as an expert witness.

To form his opinion, Dr. Cutler used: (1) the voir dire and trial testimony of Jones and Deputy Owens; (2) the handwritten statement Jones wrote on the hood of the highway patrolman's car on the night of Holloman's murder; (3) photographs of the three line-ups; and (4) photographs of the interior of Holloman's store. The expert provided opinions regarding how: (1) certainty in eyewitness identification is generally related to accuracy; (2) eyewitness confidence can be affected by suggestive procedures;

10

(3) distinctive clothing can make identification easier; (4) repeated attempts to recognize or remember information can increase confidence; (5) suggestiveness is more of a problem when memory of the perpetrator is weak; and (6) the wearing of a head covering can make it difficult to perceive a perpetrator's facial and physical characteristics.

Cutler identified two critical factors that may have increased the risk of misidentification of the in-person line-ups conducted by Deputy Owens. Cutler explained there was a significant risk of witness misidentification because: (1) Finch wore a dark three-quarter-length coat in all three line-ups in which Jones identified him and (2) Finch was placed in three successive line-ups. Nonetheless, Cutler agreed that he couldn't prove that Finch was misidentified in this particular case and that sometimes an eyewitness identifies a subject because that subject committed the crime.

## V.

### A.

"Courts have consistently emphasized that actual innocence for the purposes of *Schlup* is a procedural mechanism rather than a substantive claim." *Teleguz v. Pearson*, 689 F.3d 322, 327 (4th Cir. 2012). A valid actual innocence claim "requires petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324. A petitioner must also "demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a

11

miscarriage of justice. If a petitioner passes through the *Schlup* gateway by satisfying this standard, the district court then considers and reaches the merits of all of the petitioner's procedurally defaulted claims." *Teleguz*, 689 F.3d at 329 (internal citations omitted). In evaluating the petitioner's claim, "the district court is not bound by the rules of admissibility that would govern at trial" and must consider "all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Schlup*, 513 U.S. at 327-28 (internal quotation marks omitted).

**B.**

To establish an actual innocence claim Finch must support allegations of constitutional error with new reliable evidence that was not proffered at trial. *See Schlup*, 513 U.S. at 324. He alleges due process violations under the Fourteenth Amendment and relies on expert evidence proffered by Dr. Cutler.

We find that Dr. Cutler's evidence of impermissibly suggestive procedures supports Finch's allegations of a violation of the Due Process Clause of the Fourteenth Amendment, which protects individuals from unreliable identifications that stem from impermissibly suggestive procedures. *Manson v. Brathwaite*, 432 U.S. 98, 113 (1977); *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (finding that the "likelihood of misidentification […] violates a defendant's right to due process"). First, as Dr. Cutler explained, the fact that Finch was the only suspect wearing a three-quarter-length coat in all of the line-ups rendered the line-ups procedurally improper and may have led Jones to

12

base his identification on a cue, the coat, instead of his original memory of the perpetrator's face or other physical characteristics.  Second, Dr. Cutler explained that when a suspect wears a hat, as Finch did in one of the line-ups, it can make it difficult to remember a person's physical characteristics, and it also weakens the witness's memory.  These procedural issues support Finch's allegations of constitutional error that he was misidentified by Jones.  No reasonable juror would likely find Finch guilty beyond a reasonable doubt if it knew the high likelihood that he was misidentified by Jones both outside and inside the courtroom as a murder suspect because of impermissibly suggestive procedures.

## C.

Finch must also demonstrate that it is more likely than not that "the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt." *Teleguz*, 689 F.3d at 329.  An actual innocence finding "requires a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." *House v. Bell*, 547 U.S. 518, 539 (2006) (internal citations and quotation marks omitted).  Based on the total evidentiary record, this Court must "make a probabilistic determination about what reasonable, properly instructed jurors would do.  The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Bell*, 547 U.S. at 538 (internal citations and quotations omitted).  Looking at the record as a whole, we find that Finch satisfies this exacting standard.

As an initial matter, this is a case where there is no physical evidence implicating Finch. The theory at trial was that Jones witnessed Finch murder Holloman with a sawed-off shotgun. However, new evidence demonstrates that it was a pistol and not a shotgun that killed Holloman. Furthermore, there is new expert testimony finding that the shells recovered from the crime scene cannot be matched with the shotgun shell found in Finch's blue Cadillac. This new evidence not only undercuts the State's physical evidence, but it also discredits the reliability of Jones, who testified that he saw Finch use a sawed-off shotgun to kill Holloman. The medical and the ballistic evidence would likely cause any reasonable juror to lend credence to Finch's son's assertion that he had found a shotgun shell in his father's car months before Holloman's murder. Even Deputy Owens admits in new evidence that this sort of armed robbery would have been atypical for Finch.

The Government argues that because its theory of liability relies on the felony-murder rule it does not matter what type of firearm Finch allegedly used or who among the three black males even murdered Holloman. The record reflects that the trial court provided inconsistent instructions to the jury regarding felony murder but ultimately required the jury to find that Finch fired the fatal shot in order to convict him of first-degree murder. Consistent with this instruction, the state had argued to the jury that "Finch was the trigger man who shot and who killed Richard Holloman" because Jones testified that he saw Finch use a sawed-off shotgun. The new evidence showing that Holloman's wounds were not in fact caused by a shotgun significantly undermines this

crucial factual determination that Finch was the shooter, which the jury was instructed to make before convicting Finch of first-degree murder.

Moreover, arguments about felony-murder rule liability are non-responsive to Finch's arguments that Jones misidentified him. If Jones lacks credibility to identify a murder weapon, any reasonable juror would likely question his credibility to accurately relay what he saw the night of Holloman's murder. If Jones's account of the murder weapon cannot be trusted, then any reasonable juror likely would not credit his recollection that Finch was at the store. Harris has already provided new evidence that he most likely did not see Finch at the store that night, further calling into question Jones's recollection. Criminal liability under any theory, including the felony-murder rule, would not attach to Finch if there is no evidence that he was at Holloman's store during the murder.

Next, given the lack of physical evidence, Jones's eyewitness testimony forms the crux of the State's case against Finch, and it is more likely than not that any reasonable juror would find that Jones's account lacks credibility. For example, given the impermissibly suggestive line-up, a reasonable juror would likely doubt Jones's pretrial out-of-court identification of Finch and his in-court identification of Finch as well. Even though Jones expressed certainty about his identification, the line-up procedures would reasonably be seen to taint his credibility. In addition, there is older evidence from Taylor, also confirmed in a 2002 affidavit, that described Jones as an alcoholic and explained how Jones had cognitive issues, memory trouble, and problems with short-term recall. The evidence of Jones expressing his uncertainty to Taylor, coupled with Jones's

15

memory issues, would cause any reasonable juror to doubt his credibility as a key eyewitness.

Jones's credibility is further weakened because he did not identify key physical descriptions of Finch and Charles Lewis. Finch and Lewis both had beards the night of their arrest, and Jones did not mention this type of facial hair in his description to the police officer at the crime scene or in his statement to Deputy Owens. Any reasonable juror would look at this evidence and likely question whether Jones actually saw Finch at the store the night of the murder.

In addition, newly proffered evidence weakens previously submitted evidence corroborating Jones's eyewitness account. For instance, Harris testified during the 1976 trial that he saw Finch near the gas station. This evidence buttressed Jones's testimony that he saw Finch at the gas station the night of Holloman's murder. However, Harris's 2002 affidavit expresses doubts about whether Finch was present at the gas station that night at all. Indeed, when Deputy Owens took Harris's statement the night of the murder, it was Deputy Owens and not Harris who brought up Finch's name as a suspect. Deputy Owens questioned Harris about Finch before Harris provided any testimony relative to seeing Finch. The affidavit explains that Deputy Owens repeatedly questioned Harris, attempting to elicit testimony placing Finch at the crime scene earlier that night. However, Harris continued to express doubts, the night of the murder and as of his new affidavit, about whether he saw Finch earlier that night at Holloman's store. Harris alleges that at one point during a break in the trial Deputy Owens and a prosecutor took Harris into a room and told him that Jones was going to testify at trial that Harris was

16

present during the murder. Harris replied that Jones would be testifying to a lie. These exchanges would likely give pause to any reasonable juror. Moreover, Harris's effective recantation undercuts Jones's eyewitness identification of Finch at the gas station that night. A reasonable juror likely would decide that the State failed to prove Finch's presence at the gas station that night beyond a reasonable doubt. The record contains testimony from three alibi witnesses that would likely seem more credible to any reasonable juror given the uncertainty of whether Finch can definitively be placed at the gas station that night.

In addition to Jones's testimony, Deputy Owens's testimony provided significant support for the State's case against Finch, but new evidence regarding Deputy Owens would likely cause any reasonable juror to doubt his testimony implicating Finch in the murder. Deputy Owens was a major witness during the trial, and many of the facts describing Finch come from his testimony about what Jones relayed to him that night. For example, even though Jones and Harris were at trial, Deputy Owens provided hearsay that supplemented their own testimony. Deputy Owens's "corroborating" testimony contains details that were never in Jones's eyewitness account, such as height and weight descriptions. In addition, at trial Harris could not remember a specific time he visited Holloman's store, but Deputy Owens testified that Harris relayed to him that night that Harris visited Holloman's store from 7:45 p.m. until 8:20 p.m. Deputy Owens's hearsay testimony provided important bolstering evidence that placed Finch at the gas station at the time of Holloman's murder.

Despite this testimony implicating Finch in the murder, new evidence has surfaced that undermines Deputy Owens's credibility and that would likely have impacted any juror's assessment of his testimony. There is record evidence that Deputy Owens worked with the prosecutor in attempting to pressure Harris into testifying at trial that he was at the store *at the time* of the murder. Harris never stated that he was there at the time of the murder nor did Jones state that Harris was at Holloman's store during the murder. If Deputy Owens collaborated with the prosecution to encourage false testimony, any reasonable juror could conclude that Deputy Owens is untrustworthy. Accordingly, any reasonable juror would not likely rely on Deputy Owens's testimony as evidence beyond a reasonable doubt that Finch killed Holloman.

Considering all of the new evidence, we hold that Finch has "demonstrate[d] that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice." *Teleguz*, 689 F.3d at 329 (internal citations omitted). There is no physical evidence implicating Finch because medical and ballistic evidence demonstrates that the shotgun shell found in Finch's car cannot be definitively matched to any of the crime scene ballistic evidence. The State's key witness, Jones, has a host of credibility issues, and much of the evidence corroborating Jones's testimony, including Deputy Owens, has been undermined.

Jones's testimony about what the robbers wore the night of the murder and Finch's and Lewis's attire that night may still buttress the State's case, but a reasonable juror would likely not convict a defendant in a first-degree murder case merely because of a

18

non-descript outfit similarity without more corroborating evidence. This evidence would not cause any reasonable juror to lend dispositive weight to this allegation given the weight of the rest of Finch's actual innocence evidence.

## VI.

Finch has overcome the exacting standard for actual innocence through sufficiently alleging and providing new evidence of a constitutional violation and through demonstrating that the totality of the evidence, both old and new, would likely fail to convince any reasonable juror of his guilt beyond a reasonable doubt. We therefore reverse the district court's decision and remand Finch's federal habeas petition back through the gateway of actual innocence so that he can receive a hearing on the merits of his case.

*REVERSED AND REMANDED*