**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-6840

JUSTIN MICHAEL WOLFE,

Petitioner - Appellant,

v.

CHADWICK DOTSON, Director, Virginia Department of Corrections,

Respondent - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Michael Stefan Nachmanoff, District Judge.  (1:22-cv-00700-MSN-JFA)

Argued:  May 6, 2025                                    Decided:  July 7, 2025

Before KING, THACKER, and BERNER, Circuit Judges.

Vacated and remanded by published opinion.  Judge Thacker wrote the opinion in which Judge King and Judge Berner join.

**ARGUED:**  Scott Michael Abeles, CARLTON FIELDS, P.A., Washington, D.C., for Appellant.  Liam Alexander Curry, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Jason S. Miyares, Attorney General, Stephen G. Popps, Chief Deputy Attorney General, Theophani K. Stamos, Deputy Attorney General, Donald E. Jeffrey, III, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

THACKER, Circuit Judge:

For the fourth time, we are presented with the disposition of Justin Wolfe's ("Appellant") 28 U.S.C. § 2254 petition for habeas relief.  The facts of this case span decades and deal with conduct by the Commonwealth of Virginia (the "Commonwealth") that we and lower courts have recognized as "abhorrent to the judicial process."  *Wolfe v. Clarke*, 691 F.3d 410, 424 (4th Cir. 2012) (quoting *Wolfe v. Clarke*, 819 F. Supp. 2d 538, 566 n.24 (E.D. Va. 2011)).  Twenty-four years ago, the Commonwealth decided that Appellant was a guilty man.  From that moment, the Commonwealth has done everything in its power to ensure Appellant dies in prison, eschewing the Constitution, ethical strictures, and Appellant's own repeated and consistent assertions of actual innocence.

This instant appeal arises from the district court's dismissal of Appellant's § 2254 petition on the ground that Appellant failed to proffer new, reliable evidence in support of his *Schlup* actual innocence claim, which operated as a procedural "gateway" to the merits of Appellant's otherwise defaulted substantive claims.  *Schlup v. Delo*, 513 U.S. 298, 315 (1995) (establishing that habeas petitioners who adequately allege a claim of actual innocence may have their "otherwise barred constitutional claim[s] considered on the merits").  In support of his *Schlup* claim, Appellant relies on an exculpatory declaration by Owen Barber, the perpetrator of the underlying murder and the only witness to ever connect Appellant to the crime.  The district court dismissed Appellant's *Schlup* claim, reasoning both that Barber's declaration was not new evidence, since Barber had previously exculpated Appellant, and that the declaration was not reliable given Barber's history of providing conflicting testimony.

2

We conclude otherwise. Barber's declaration constitutes new evidence because it rendered Barber available to Appellant as an exculpatory witness when Barber had previously been unavailable pursuant to his invocation of his Fifth Amendment privilege. And Barber's declaration is reliable evidence because it was consistent with Barber's prior credible testimony exculpating Appellant.

Therefore, as detailed below, we vacate the district court's judgment and remand for adjudication of Appellant's substantive claims.

## I.

## A.

## 1.

## Background

On March 15, 2001, Barber shot and killed Daniel Petrole in Bristow, Virginia. At the time, Barber and Petrole were both 21 year old marijuana dealers in northern Virginia. Barber was a low level distributor and Petrole was a supplier for other marijuana dealers in the area. After the shooting, Barber told one of his friends, J.R. Martin, what he had done and Martin subsequently reported Barber to the authorities. After being initially interviewed by the police, Barber fled to San Diego where he was subsequently arrested and escorted back to Virginia for prosecution. Once in custody, Barber confessed to murdering Petrole. Barber ultimately pled guilty to non capital murder and was sentenced to sixty years of imprisonment.

On May 7, 2001, a Prince William County jury indicted Appellant for hiring Barber to murder Petrole. Appellant, 20 years old at the time, was Barber's high school friend and

3

fellow marijuana dealer in the northern Virginia area. Appellant purchased his marijuana supply directly from Petrole.

Pursuant to a superseding indictment, Appellant was charged with capital murder for hiring Barber to murder Petrole, using a firearm in the commission of a felony, and conspiring to distribute marijuana.

2.

<u>The Trial</u>

On January 22, 2002, a jury convicted Appellant on all charges. At trial, Barber "was the prosecution's **key witness** . . . and *the only witness* to provide any direct evidence regarding the 'for hire' element of the murder offense and the involvement of [Appellant] therein." *Wolfe v. Johnson*, 565 F.3d 140, 144 (4th Cir. 2009) (emphases supplied) (hereinafter "*Wolfe I*"). Appellant testified in his own defense and denied any involvement in Petrole's death.

Following his conviction, Appellant was sentenced to death on the murder for hire charge. He was also sentenced to thirty years for the narcotic charge and three years for the firearm charge. The Supreme Court of Virginia affirmed the convictions and dismissed Appellant's petition for a writ of habeas corpus. The United States Supreme Court denied certiorari and Appellant's request for a stay of execution.

4

B.

1.

<u>Initial Section 2254 Proceedings -- *Wolfe I*</u>

On July 22, 2005, Appellant moved in the Eastern District of Virginia for a stay of execution and appointment of counsel to file a petition for a writ of habeas corpus. The court granted both motions, and Appellant filed a habeas petition pursuant to 28 U.S.C. § 2254 on November 7, 2005.

After filing his initial § 2254 petition, Appellant obtained an affidavit executed by Barber (the "Barber Affidavit") wherein Barber "repudiated his trial testimony and exculpated Wolfe from the murder-for-hire scheme." *Wolfe I*, 565 F.3d at 144. Appellant also secured affidavits from two people who had previously resided with Barber. In his affidavit, Barber's former roommate, Jason Coleman, averred that he "told prosecutors that [] Barber had confessed to [him] that [Barber] acted alone in the murder of [] Petrole." *Wolfe I*, 565 F.3d at 153. Likewise, Barber's former cellmate, Carl Huff, averred that Barber had admitted that "[Appellant] was in no way involved in the shooting of Petrole" and that Barber had testified falsely at Appellant's trial. *Id.* Both of these affidavits corroborated the allegations in the Barber Affidavit.

According to the Barber Affidavit, the officers who initially interviewed Barber threatened him with the death penalty if he did not cooperate in Appellant's prosecution. Per Barber, "on the flight back to Virginia from California, the officers accompanying Barber 'told [him] they already knew that [Appellant] had hired [Barber] to kill [] Petrole and that one of [them] would end up telling the story and the other one would end up with

5

capital murder.'" *Wolfe I*, 565 F.3d at 152 (quoting Barber Affidavit, J.A. 1169[1]) (cleaned up). Barber specified, "I did not suggest that story to the detectives; they were the first to mention it to me." J.A. 1169. Moreover, per the Barber Affidavit, once Barber was detained at Prince William County jail, Detective Sam Newsome and another Commonwealth officer, Detective Brenda Walburn, "repeatedly told [Barber] they and the prosecutors knew that [Appellant] had hired [Barber] to kill [] Petrole, had linked [Barber's] gun to the killing, and would pursue capital murder against either [Appellant] or [Barber]." *Id.*

After Barber had been in jail for a couple of days, his assigned attorney visited him to "l[ay] out the Commonwealth's offer that [Barber] testify against [Appellant] and therefore be protected from prosecution for capital murder." J.A. 1169. Barber's attorney told him the "prosecutors already knew about [Appellant] hiring [Barber] to kill [] Petrole and that, based on what they already knew, one of [them] would certainly be convicted of capital murder." *Id.* Over the course of the following week, Newsome, Walburn, and other Commonwealth personnel (together, the "Commonwealth Officers")[2] continued to "repeat[] that they already knew what had happened and that [Barber] needed to tell them." *Id.* at 1170. According to Barber, the Commonwealth Officers, "were entirely focused on

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[2] In the Barber Affidavit, Barber recounts being interviewed multiple times by Newsome, Walburn, and various additional unnamed Commonwealth personnel. As the Barber Affidavit does not distinguish these specific interviews or who conducted them, we have defined these officers together with Newsome and Walburn as the "Commonwealth Officers."

6

[Appellant] as a suspect." *Id.* And Barber's attorney warned him that if he did not "implicate [Appellant] . . . prosecutors would seek the death penalty against [him] and would succeed." *Id.*

Barber recounted that he ultimately "agreed to testify against [Appellant] . . . because [Barber] did not want to face the death penalty." J.A. 1171. The Commonwealth Officers had made it clear "it was either do this or die." *Id.* Therefore, on April 27, 2001, Barber met with the Commonwealth Officers and "agreed to cooperate." *Id.* at 1172. Barber "knew that [the Commonwealth] wanted to hear that [he] had been hired by [Appellant] to kill [] Petrole." *Id.* Accordingly, he "made up a story . . . with lies woven in to turn the story into a murder for hire." *Id.*

Barber subsequently signed a plea of guilty with an "oral agreement . . . that [the Commonwealth] would recommend leniency to [Barber's sentencing] judge." J.A. 1172. Barber explained, "[the Commonwealth was] sure that the judge would be lenient because of my cooperation if I testified against [Appellant]." *Id.* at 1172–73. In accordance with this coercive arrangement, Barber "fabricated his trial testimony" in order to tell "the story that [the] prosecutors wanted to hear." *Wolfe I*, 565 F.3d at 152–53 (citation omitted). Barber took this position to save his own life:

> At the time of my arrest and the trial, I figured that I would do anything to avoid the death penalty and to try to get myself out of the situation I had got myself into. I would tell prosecutors and the police what they wanted to hear.

J.A. 1174. In his affidavit, Barber explained he was recanting his testimony because Appellant "[did] not deserve to die for something he did not do." *Id.*

7

Based on the Barber Affidavit and the corroborating affidavits by Coleman and Huff, Appellant amended his § 2254 petition on December 15, 2005, making a litany of claims. As recited in *Wolfe I*, Appellant's first set of claims challenged the penalty phase jury deliberations at his trial. He alleged that the jury had been improperly influenced in two instances. First, when the foreman placed a picture of his own son next to a photograph of Petrole's autopsy, before asking "the other jurors if [they] wanted that to happen to [their] sons." *Wolfe I*, 565 F.3d at 148 (alterations in original). And, second, when a juror spoke to his wife on the telephone during deliberations. Appellant also claimed that his trial counsel had been constitutionally deficient pursuant to *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984) (holding that criminal defendants are entitled to constitutionally adequate counsel), because his counsel moved to strike a potentially favorable juror during jury selection.

Appellant's second set of claims asserted that Appellant was actually innocent of murdering Petrole, relying on the Barber Affidavit and the corroborating affidavits by Coleman and Huff. Appellant first relied on the Supreme Court's decision *Herrera v. Collins*, 506 U.S. 390 (1993), where the Court "assume[d], for the sake of argument . . . that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Wolfe I*, 565 F.3d at 164 (quoting *Herrera*, 506 U.S. at 417). The threshold for relief for "such an assumed right would necessarily be extraordinarily high." *Id.* (quoting *Herrera*, 506 U.S. at 417).

8

Appellant's second actual innocence claim relied on the Supreme Court's decision in *Schlup v. Delo*, 513 U.S. 298 (1995), which held that a habeas petitioner may have his otherwise defaulted constitutional claims heard on the merits if he alleges an adequate claim of actual innocence.  In contrast to a *Herrera* claim, a *Schlup* claimant must allege "a less-stringent—though nevertheless rigorous . . . showing of actual innocence." *Wolfe I*, 565 F.3d at 164.  Moreover, a successful *Schlup* claim differs from a *Herrera* claim, because a *Schlup* claim is not an independent substantive claim.  Rather, a successful *Schlup* claim establishes a "procedural gateway" for the claimant to "secure the adjudication of his otherwise defaulted constitutional claims." *Wolfe I*, 565 F.3d at 164. In Appellant's case, he sought to use his *Schlup* claim as a "procedural gateway" for adjudication of several constitutional claims, which the district court had determined were procedurally defaulted because they had not been properly raised in state court proceedings.

In Appellant's final set of claims, Appellant asserted that he was entitled to an evidentiary hearing on his *Schlup* claim, and on his claims relying on *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment"), and *Giglio v. United States*, 405 U.S. 150, 153 (1972) (holding that the "deliberate deception of a court and jurors by the presentation of known false evidence" violates due process).  In Appellant's *Brady* claim he alleged, inter alia, that the Commonwealth had failed to disclose material impeachment evidence concerning Barber.  Appellant's *Giglio* claim asserted, inter alia, that the Commonwealth had

9

coordinated Barber's testimony with testimony by another Commonwealth witness, Martin, thereby presenting false evidence to the jury.[3]

The Commonwealth moved to dismiss Appellant's amended petition. On February 8, 2008, the district court granted the Commonwealth's motion, dismissing Appellant's amended petition in its entirety. *See Wolfe v. Johnson*, No. CIV.A. 2:05-CV-432, 2008 WL 371117, at *1 (E.D. Va. Feb. 8, 2008) (J. Jackson), *aff'd in part*, *vacated in part*, *remanded*, 565 F.3d 140 (4th Cir. 2009).

Appellant appealed the district court's judgment, which we adjudicated in *Wolfe I*. In *Wolfe I*, we vacated the court's judgment for failing to consider Appellant's *Schlup* actual innocence claim on the merits. Specifically, we: "instructed the district court to determine whether [Appellant] was entitled to an evidentiary hearing and other discovery; to decide in the first instance whether, under [*Schlup*], [Appellant] had made a sufficient showing of actual innocence to clear any procedural bars to his constitutional claims []; and to assess anew [Appellant]'s claim, among others, that the [Commonwealth] had

---

[3] As noted, Martin was "a close friend of Barber and provided him with a car to use on the night of [Petrole's] murder." *Wolfe v. Clarke*, 819 F. Supp. 2d 538, 555 (E.D. Va. 2011). At Appellant's trial, the Commonwealth called Martin to corroborate Barber's testimony. Specifically, Martin "corroborated Barber's testimony that Barber had private conversations with [Appellant] before the murder . . . and after the murder." *Id.* Martin also "speculat[ed]," that although "Barber did not tell him why he killed Petrole," it was "obvious" that he killed Petrole at Appellant's instruction. *Id.* at 550–51. According to Appellant, the Commonwealth had "coordinated" Martin's testimony in a joint meeting with Barber, Martin, and the Commonwealth prosecutors, without disclosing that meeting to Appellant's trial counsel. *Id.* at 555. Further, Appellant's counsel was "unable to effectively impeach Martin's testimony [at trial] because the [Commonwealth] withheld an off the record agreement not to prosecute [] Martin [for his involvement in Petrole's murder] if he cooperated with the Commonwealth." *Id.* at 555–56.

contravened his Fourteenth Amendment due process rights, as recognized in *Brady v. Maryland*, 373 U.S. 83 (1963), by suppressing favorable and material evidence." *Wolfe v. Clarke*, 691 F.3d 410, 413 (4th Cir. 2012) (cleaned up) (hereinafter, "*Wolfe II*").

On remand, the district court authorized discovery. During discovery, the Commonwealth produced a plethora of previously undisclosed material evidence. The court subsequently held an evidentiary hearing, wherein Barber corroborated his affidavit by "ma[king] a credible recantation of his trial testimony and indicat[ing] that [Appellant] was not involved in the murder of [] Petrole." *Wolfe*, 819 F. Supp. 2d at 548. Consequently, the court "determined that [Appellant] was entitled to habeas corpus relief premised on, inter alia, the Commonwealth's manifold violations of [Appellant]'s *Brady* rights." *Wolfe II*, 691 F.3d at 415. The court also granted Appellant relief pursuant to his *Giglio* and venireman claims. On these grounds, the court issued a judgment directing the Commonwealth to retry Appellant within 120 days or release him unconditionally.

2.

Section 2254 Judgment -- *Wolfe II*

On appeal, in *Wolfe II*, we found it unnecessary to parse the mass of prejudicial material the Commonwealth withheld from Appellant, or to address the merits of Appellant's *Giglio* and venireman claims or Appellant's unadjudicated claim that his continued detention violated due process.[4] The prejudicial materials withheld by the

---

[4] After Barber testified under oath in the evidentiary hearing before the district court, Appellant successfully moved to amend his petition to raise a claim pursuant to *Sanders v. Sullivan*, 863 F.2d 218 (2d Cir. 1988). In *Sanders*, the Second Circuit held "a state's failure (Continued)

11

Commonwealth are detailed extensively in the district court's opinion in *Wolfe v. Clarke*, 819 F. Supp. 2d 538 (E.D. Va. 2011), and in the dissent to *Wolfe v. Clarke*, 718 F.3d 277 (4th Cir. 2013) (hereinafter, "*Wolfe III*"). As a "sampling," *Wolfe III*, 718 F.3d at 294 (Thacker J., dissenting): (i) the Commonwealth withheld evidence that Barber possessed potential motives for murdering Petrole; (ii) the Commonwealth withheld evidence that Coleman informed the prosecution that Barber had confessed to acting alone; (iii) the Commonwealth withheld evidence suggesting that Barber knew Petrole before the murder, that Barber owed Petrole money, that Petrole had a hit out on Barber, and that Barber had a close relationship with Petrole's roommate; (iv) the Commonwealth withheld impeachment evidence, including information relating to a deal the Commonwealth made with Martin in exchange for his cooperation; (v) the Commonwealth withheld a recorded statement made by its witness Chad Hough that conflicted with his trial testimony; (vi) the Commonwealth withheld evidence which could have allowed Appellant to present an alternate theory of the Petrole murder: various reports and witness statements relating to a parallel drug investigation that indicated conflict in Petrole's drug business unrelated to Appellant's purported motive for having Petrole murdered, evidence that Petrole was rumored to be a government informant constituting yet another possible motive for his murder, and the statements of three witnesses that they saw a second car at the crime scene

---

to act to cure a conviction founded on a credible recantation by an important and principal witness . . . constitute[s] a due process violation." *Id.* at 224. Pursuant to *Sanders*, Appellant claimed the Commonwealth violated his due process rights by maintaining his conviction for murdering Petrole after Barber credibly recanted his incriminating testimony. The district court did not rely on Appellant's *Sanders* claim to render judgment.

shortly after the Petrole murder; and (vii) the Commonwealth used Barber's trial testimony despite being on notice that it contained falsities. This listing is non-exhaustive and represents only a snapshot of the Commonwealth's decades long misconduct in the course of its prosecution of Appellant.

In *Wolfe II*, we concluded that a "single, plainly momentous item of suppressed Barber impeachment evidence" sufficed to affirm the district court's adjudication of Appellant's *Brady* claim. *Wolfe II*, 691 F.3d at 417. Namely, a police report written by Detective Newsome (the "Newsome Report") "reflecting that—before Barber ever asserted that [Appellant] hired him to murder Petrole—Prince William County Detective Newsome advised Barber that he could avoid the death penalty by implicating [Appellant]." *Id.* (discussing the Newsome Report); *see also id.* at 418 n.7 ("While we look no further than the Newsome [R]eport today, we do not condone the prosecution's apparent suppression of other *Brady* material and the pattern of conduct that it reveals."). As we noted in *Wolfe II*, the "Commonwealth inexplicably withheld the Newsome [R]eport from [Appellant] until the[] 28 U.S.C. § 2254 proceedings in 2010." *Id.* at 417. Moreover, Barber corroborated the Newsome Report in his testimony at the evidentiary hearing before the district court. He explained that the Commonwealth "said they wanted the truth, but at the same time they said that this is what you have got to say or you are getting the chair." *Id.* at 418.

After undertaking the *Brady* analysis in *Wolfe II*, we affirmed the district court's judgment. We held, "[t]he Newsome [R]eport [wa]s indubitably impeaching, in that it establishe[d] a motive not only for Barber to implicate someone else, but to point the finger

13

specifically at [Appellant]." *Wolfe II*, 691 F.3d at 423 (explaining that the Newsome Report demonstrated "Newsome fed Barber the crux of his testimony, i.e., that he was hired by [Appellant] to murder Petrole"). Moreover, we held that the suppression of the Newsome Report was "entirely intentional" as an outcome of the Commonwealth's "flabbergasting" policy of declining to turn over discovery to defendants for fear that they could "fabricate a defense." *Id.* at 423–24 (describing the Commonwealth's actions as "abhorrent to the judicial process"). And the Newsome Report was material because, as the Commonwealth conceded, "but for [Barber's] testimony [Appellant] probably would not have been prosecuted." *Id.* at 424.

Consequently, we ordered that the district court's judgment directing the Commonwealth to retry Appellant within 120 days or release him unconditionally should take effect in accordance with Federal Rule of Appellate Procedure 41, upon the issuance of our mandate.

3.

The Commonwealth Coerces Barber Yet Again

Our mandate in *Wolfe II* affirming the district court's judgment issued on September 7, 2012. Incredibly, just four days later, on September 11, Detective Newsome; the Commonwealth prosecutor, Richard Conway; and assistant prosecutor, Paul Ebert, interviewed Barber in prison and again undertook the precise tactic they had used to coerce Barber's testimony in 2001. They once again told Barber: "this is what you have got to say or you are getting the chair." *Wolfe II*, 691 F.3d at 418 (recounting the

14

Commonwealth's prior history of threatening Barber with the death penalty if he did not incriminate Appellant).

At the inception of the interview, Barber reiterated to Newsome, Conway, and Ebert that he intended to testify at Appellant's re-trial as he had in federal court "where he reconfirmed that [Appellant] was not 'involved in the murder of [] Petrole[.]'" *Wolfe III*, 718 F.3d at 296 (Thacker J., dissenting) (citation omitted). Through a combination of religious browbeating and threats, Newsome, Conway, and Ebert pressured Barber "to repeat his 2002 trial testimony [at Appellant's] retrial." *Id.* at 295. Specifically, Newsome, Conway, and Ebert told Barber that if he testified otherwise -- as he had in his federal testimony exculpating Appellant from Petrole's murder -- then he would be in breach of his plea agreement and subject to capital charges. Newsome, Conway, and Ebert coerced Barber to stick to his 2002 trial testimony incriminating Appellant, "despite being on notice that it contained falsities," *Wolfe*, 819 F. Supp. 2d at 571 (discussing facts known by the Commonwealth at the time of Appellant's trial demonstrating "that Barber's trial testimony implicating [Appellant] was false"), and despite knowing Barber had made a "credible recantation" in federal court, *id.* at 570.

Citing United States Supreme Court precedent, Conway informed Barber that even though he thought he "c[ouldn't] be tried for capital murder [] because [he] already pled guilty to first degree murder . . . if [Barber] ever testified differently [his] statements could be used . . . to prosecute [him anew]." J.A. 446. When Barber asked how his conviction for first degree murder would "make the jump from first to capital," *id.* at 449, Conway informed Barber that would be a consequence of Barber's "breach of the [plea]

15

agreement[,]" *id.* at 450. Ebert directly threatened Barber: "we would bring the charge against you, capital murder." *Id.*

After this "last-ditch effort to intimidate Barber into implicating [Appellant] once and for all," *Wolfe III*, 718 F.3d at 298 (Thacker J., dissenting), Commonwealth prosecutor Conway and assistant prosecutor Ebert recused themselves from the case. According to the Commonwealth, its attorneys recused themselves because "the history of the case to that point and the criticism that had been leveled at them would be a distraction in continuing the prosecution of the case." *Id.* at 298 n.1 (cleaned up).

4.

Appellant's Re-trial Proceedings

The Commonwealth then appointed a special prosecutor to proceed with Appellant's re-trial for his original charges: capital murder for hiring Barber to kill Petrole, use of a firearm in commission of a felony, and conspiring to distribute marijuana. On October 1, 2012, a grand jury returned a superseding indictment alleging six new charges "arising from the events underlying [Appellant]'s original charges" to supplement the original charges. *Wolfe III*, 718 F.3d at 282. In total, Appellant was charged with: (i) capital murder for hiring Barber to kill Petrole; (ii) capital murder by order of a person engaging in a continuing criminal enterprise; (iii) first degree felony murder; (iv) use of a firearm in the commission of a felony; (v) use of a firearm in the commission of a murder; (vi) use of a firearm in the commission of a robbery or attempted robbery; (vii) conspiracy to distribute marijuana; (viii) leading a continuing criminal enterprise to distribute between $100,000 and $250,000 worth of marijuana in a 12 month period; and (ix) leading a

16

criminal conspiracy to distribute more than $250,000 worth of marijuana in a 12 month period.

On October 31, 2012, the Virginia trial court held a hearing on, inter alia, Appellant's motion to disqualify the special prosecutor. At the hearing Appellant argued that the special prosecutor had a conflict of interest because he was "a friend, [] a financial contributor, [and] a political ally" to Conway and Ebert. J.A. 785. Therefore, Appellant asserted that the special prosecutor could not serve as an "objective prosecutor" in Appellant's re-trial. *Id.* at 787. Barber was called to testify at the hearing to discuss the September 11 interview with Newsome, Conway, and Ebert. On the stand, Barber, through his attorney and in his own testimony, invoked his Fifth Amendment privilege against self-incrimination "as to any questions." *Id.* at 877. The circuit court accepted Barber's assertion of privilege and did not compel his testimony. The court subsequently denied Appellant's motion to disqualify.

Thereafter, the state court scheduled Appellant's re-trial for January 2, 2013. On November 16, 2012, Appellant filed a motion to enforce judgment in the district court that had granted his habeas petition. Therein, Appellant alleged the Commonwealth had "neither released him unconditionally nor provided him with a new trial within 120 days of the [August 30, 2011 district court] Order." *Wolfe III*, 718 F.3d at 283. Appellant also alerted the district court about the September 11, 2012 jailhouse interview that Newsome, Conway, and Ebert had with Barber.

17

5.

Section 2254 Enforcement Proceedings

The district court issued an order for the Commonwealth "to show cause why the Barber interview 'does not constitute extraordinary circumstances warranting the Court to order [Appellant's] immediate release and bar current and future prosecutions of [Appellant] on all charges related to the death of [] Petrole and drug conspiracy crimes.'" *Wolfe III*, 718 F.3d at 283. On December 13, 2012, the court conducted an evidentiary hearing on its order. At the hearing, Barber's lawyer testified that "upon his advice, Barber ha[d] already invoked his Fifth Amendment privilege in state court." *Wolfe III*, 718 F.3d at 298 (Thacker J., dissenting). Moreover, Barber's attorney testified, "based on the contents of th[e] tape [from the September 11 jail visit], my advice will not change about whether [Barber] should testify [at Appellant's re-trial] unless there's a new development[.]" *Id.*

On December 26, 2012, the district court entered an order enforcing its judgment. In its order, the court held that the Commonwealth had not complied with the court's grant of habeas relief because it had failed to unconditionally release Appellant or retry him within 120 days. Citing the "extraordinary circumstances" evidenced by the Barber interview, the court exercised its discretion and barred the Commonwealth from re-trying Appellant for any charges relating to the death of Petrole or that would require Barber's testimony. In support of its order, the court stated that the Commonwealth's coercive interview of Barber had "crystallized" the "constitutional defects in [Appellant]'s original convictions." *Wolfe v. Clarke*, No. 2:05-CV-432, 2012 WL 13103658, at *13 (E.D. Va.

18

Dec. 26, 2012). The court determined that a re-trial bar was necessary, therefore, because any re-trial proceedings would be tainted by the same constitutional violations that had justified granting Appellant habeas relief pursuant to § 2254. That is, in a re-trial, Appellant would not be able to call Barber as a witness -- since Barber would invoke his Fifth Amendment privilege on the advice of his counsel -- to rebut Barber's incriminating testimony from the 2001 trial when the Commonwealth proffered that testimony to a jury.

6.

Enforcement Proceedings on Appeal -- *Wolfe III*

On appeal again, in *Wolfe III*, we vacated the district court's remedy. Specifically, we held that the circumstances of Appellant's case were not "sufficiently extraordinary to warrant federal interference with [the Commonwealth's] reprosecution of a [] § 2254 petitioner." *Wolfe III*, 718 F.3d 277, 290 (4th Cir. 2013). We recognized that such a remedy was, by necessity, "extremely rare[,]" and could only be employed in "situations where a recognized constitutional error cannot be remedied by a new trial." *Id.* Despite the gravity of the Commonwealth's violation of Appellant's constitutional rights, we concluded that the violations were not "[in]capable of being remedied in a new trial." *Id.* Nonetheless, we noted that Appellant's "due process claim with respect to the Barber interview could, at the proper time, constitute a separate ground for federal habeas corpus relief." *Id.*

Thus, the case was remanded once again to the state court.

19

7.

Appellant's Guilty Plea

Back in state court, Appellant moved unsuccessfully to dismiss the indictment based on vindictive prosecution because he was now "subject[] to harsher charges," and for prosecutorial misconduct in connection with the Barber interview.  J.A. 95.  Ultimately, "[c]oncluding he had no hope of a fair trial, and without his star witness, [Appellant] pled guilty [on March 29, 2016] to the use of a firearm in the commission of a felony, conspiracy to distribute marijuana, and murder."  Appellant Br. at 18.  Appellant was sentenced to a total of 41 years of incarceration.

On direct appeal to the Virginia Court of Appeals, Appellant asserted that his plea was involuntary because: (i) he had been the target of vindictive prosecution; and (ii) the plea was the product of prosecutorial misconduct.[5]  On May 10, 2017, the Virginia Court of Appeals dismissed Appellant's appeal, holding that he had forfeited his arguments pursuant to Virginia Rule 5A:18 (requiring that errors must be presented to the trial court in order to be preserved), by pleading guilty.  The Supreme Court of Virgina denied Appellant's further petition for appeal.

On a petition for a writ of certiorari, the United States Supreme Court issued a summary order vacating the judgments in Appellant's direct appeal and remanding for consideration in light of its 2018 decision in *Class v. United States*, 583 U.S. 174, 178

---

[5] Appellant also asserted that the trial court had erred by assigning Appellant the costs of his prosecution, but that argument is not material to this appeal.

20

(2018), holding that "a plea of guilty to a charge does not waive a claim that—judged on its face—the charge is one which the State may not constitutionally prosecute." On remand from the Supreme Court of Virginia following the remand from the Supreme Court of the United States, the Court of Appeals of Virginia acknowledged that *Class* authorized defendants to assert claims that "call[ed] into question the [Commonwealth]'s power to 'constitutionally prosecute,'" such as prosecutorial vindictiveness. J.A. 1684 (quoting *Class*, 583 U.S. at 181–82). Therefore, the Court of Appeals of Virginia held that Appellant could pursue his vindictive prosecution claim. Nonetheless, the Virginia Court of Appeals dismissed Appellant's vindictive prosecution claim as forfeited pursuant to Rule 5A:18, because Appellant had argued for the first time on appeal that the prosecution was vindictive because it resulted in a "greater minimum sentence" than the initial prosecution. *Id.* at 1686 (emphasis omitted).

The Supreme Court of Virginia and the United States Supreme Court both declined further review.

## C.

## Instant Habeas Petition

On June 22, 2022, Appellant filed the instant § 2254 habeas petition in the Eastern District of Virginia against the Director of the Virginia Department of Corrections ("Appellee"). But Appellant filed his petition a day late, thereby violating the one year statute of limitations for applications for a writ of habeas by inmates in state custody. *See Rouse v. Lee*, 339 F.3d 238, 243 (4th Cir. 2003) (citing 28 U.S.C. § 2244). Appellant's petition asserted a claim for vindictive prosecution and for ineffective assistance of

21

counsel. Appellant argued that his vindictive prosecution claim was still available for § 2254 habeas relief, even though Virginia courts had deemed that claim to be forfeited. J.A. 30 (arguing that Appellant's vindictive prosecution claim was not subject to "[t]he procedural default doctrine"). Appellant made no argument to excuse his failure to comply with the statute of limitations for filing a § 2254 petition.

On April 12, 2023, Barber signed a new declaration (the "Barber Declaration"). In the Barber Declaration, Barber averred that Appellant "had nothing to do with the killing of [] Petrole[,]" there was "no agreement between [Appellant] and [Barber] to kill [] Petrole[,]" and "[Appellant] did not know [Barber] was going to kill [Petrole]." J.A. 570. Barber explained that he had originally testified against Appellant because Barber "felt that [he] had to choose between falsely testifying against [Appellant] or dying" given that the Commonwealth threatened him with the death penalty. *Id.* Barber reaffirmed his subsequent, multiple recantations of his incriminating trial testimony, even though he "had no assurance that the [Commonwealth] would not retaliate against [him] if he testified in [Appellant]'s favor." *Id.* at 572.

Barber went on to declare that after Appellant was granted habeas relief in *Wolfe II*, Newsome, Conway, and Ebert arrived at Barber's prison without notice and without providing Barber an opportunity to contact his attorney. Barber stated that he had initially told Newsome, Conway, and Ebert that he would testify at Appellant's re-trial consistent with his federal testimony exculpating Appellant. Barber noted that Newsome, Conway, and Ebert then told Barber he would "be charged with capital murder . . . [and therefore subject] to the death penalty" if he "testified at [Appellant]'s retrial as he did in federal

22

court." J.A. 573. As a result of that encounter, Barber "decided [he] was too afraid to testify further in [Appellant]'s case." *Id.* at 575. Barber "did not want to be retried for capital murder and, given [his] confessions, likely sentenced to death after trial." *Id.* ("I believe that if I had testified in [Appellant]'s favor at a retrial, there is a good chance I would not be alive today.").

Barber then explained that he had exercised his Fifth Amendment privilege against self-incrimination in subsequent proceedings because he "believed the [Commonwealth] would act on its threats if [Barber] testified truthfully." J.A. 576. Barber stated, "[f]rom that point in 2012 until very recently, I had resolved that I would never again offer another statement or testify in [Appellant]'s case, as I still believed the Commonwealth would follow through on its threat to prosecute me again." *Id.* at 576. If not for the threats against him by the Commonwealth, Barber "would have testified truthfully -- in [Appellant]'s favor -- at [Appellant's] retrial, as [he] had in federal court." *Id.*

Barber went on to explain that he "was asked recently by [his] attorney if [he] would be willing to make a new statement about the case, including about [Appellant]'s involvement." J.A. 576. Barber understood that such a statement could be offered in connection with Appellant's post-conviction proceedings. Further, Barber understood that such a statement "[would] not benefit [Barber] in any way other than getting the truth out there." *Id.* Barber concluded his declaration by stating that Appellant had "served a lot of time for a crime that he did not commit" and that if he "had been able to freely testify in [Appellant's] favor at [Appellant's] retrial, [he] would have." *Id.* at 577.

23

On May 31, 2023, Appellant filed an amended habeas petition based on the Barber Declaration. In addition to the Barber Declaration, Appellant attached a declaration from Barber's lawyer, attesting that:

- Barber would never have voluntarily testified at Appellant's re-trial, J.A. 2147 ("Had Mr. Barber been called to testify for either party at [Appellant]'s retrial, he would have asserted his Fifth Amendment privilege. From my perspective, no one ever questioned this fact or believed Mr. Barber might change his mind and testify.");

- The Commonwealth never approached him about an immunity agreement for Barber, J.A. 2147 ("No prosecutor [] ever contracted me at all concerning Mr. Barber, let alone to discuss immunity."); and

- An immunity deal could never have been reached, J.A. 2147 ("In my opinion, [the Commonwealth] would never have offered Mr. Barber immunity for the purpose of allowing him to give the same allegedly-perjured testimony again at [Appellant's] retrial.").

Appellant's amended petition asserted two substantive claims: (1) a vindictive prosecution claim; and (2) a due process claim based on the Commonwealth's intimidation of Barber. As characterized by the district court, Appellant asserted that "his plea was involuntary because Appellant's second prosecution was unconstitutionally vindictive and because [the Commonwealth] suppressed potential exculpatory testimony from a key witness." J.A. 2149. Both claims were procedurally defaulted because, as the Virginia Court of Appeals had concluded, Appellant had failed to preserve his claims according to Virginia Rule 5A:18. In addition, Appellant's § 2254 petition was untimely by a single day. And Appellant did not make any attempt to satisfy the stringent requirements of equitable tolling to satisfy the § 2254 limitations period.

In his amended petition, Appellant asserted a new *Schlup* actual innocence claim, to act as a procedural gateway for the district court to consider his defaulted claims on the merits. As discussed *supra*, a *Schlup* claim is not an independent claim for substantive relief. It is purely procedural in nature, providing "a meaningful avenue by which to avoid [the] manifest injustice" of consigning a plausibly innocent habeas petitioner's constitutional claims to procedural default. *Wolfe I*, 565 F.3d at 164 (quoting *Schlup*, 513 U.S. at 327). Pursuant to *Schlup*, "a § 2254 petitioner [may] secure the adjudication of his otherwise defaulted constitutional claims" if he can meet his "rigorous" burden of demonstrating adequate actual innocence. *Id.*

On March 28, 2024, the district court granted Appellee's motion to dismiss Appellant's amended petition. In doing so, the court held that it could not reach the merits of Appellant's arguments because Appellant's petition was untimely. J.A. 2159 (recognizing that, pursuant to 28 U.S.C. § 2244(d)(1), Appellant's "[one year] limitations period began on June 21, 2021, when the United States Supreme Court denied [Appellant]'s petition for a writ of certiorari"). The court noted that Appellant did not dispute that his petition was untimely, nor did Appellant "address the statute of limitations issue or equitable tolling at all." *Id.* at 2160. Rather, Appellant relied "on grounds of actual innocence" in order to overcome the statute of limitations. *Id.* at 2160–62.

Citing *Rouse v. Lee*, 339 F.3d 238, 251 (4th Cir. 2003), the district court held that Appellant could not rely on an assertion of actual innocence to "overcome[e] procedural barriers to the merits of [his] petition." J.A. 2160 ("The Court understands *Rouse* to reject any 'consideration of the merits of time-barred claims to creep into the equitable tolling

25

analysis,' including whether Petitioner can demonstrate actual innocence . . . ." (quoting *Rouse*, 339 F.3d at 251)). The court alternatively dismissed Appellant's actual innocence claim on the merits because it concluded that the Barber Declaration was not "new reliable evidence." *Id.* at 2161 ("A threshold requirement of *Schlup* is that [Appellant] present 'new reliable evidence.'" (quoting *Schlup*, 513 U.S. at 324)).

Appellant moved for reconsideration of the district court's holding that actual innocence does not provide an exception to the habeas statute of limitations. In denying Appellant's motion for reconsideration, the court recognized that the "Supreme Court held that 'actual innocence, if proved, serves as a gateway through which a petitioner may pass,' including when the procedural bar is the 'expiration of the statute of limitations.'" J.A. 2167 (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013)). On the merits, however, the court adhered to its prior holding that Appellant's *Schlup* actual innocence claim was deficient because the Barber Declaration was not "new" or "reliable." *Id.* at 2167–70. The court explained:

> Barber's most recent declaration is not "new reliable evidence" pertaining to [Appellant]'s purported innocence because it does not contain new information concerning Petrole's murder: Barber's most recent explanation of events is consistent with the version of events he offered in his previous testimony in [Appellant]'s federal habeas proceedings, which the Fourth Circuit had already considered when it permitted the Commonwealth to retry [Appellant] for capital murder. The Barber declaration simply offers no new information relative to when [Appellant] entered his guilty plea.

*Id.* at 2168 (internal citation omitted).

26

Pursuant to the district court's certificate of appealability, Appellant timely noted this appeal.

## II.

We possess jurisdiction over the district court's adjudication of Appellant's § 2254 petition because the court issued a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2). Our review considers a single issue: whether the district court erred in holding that Appellant had failed to establish a *Schlup* actual innocence claim. We consider that question de novo. *Wood v. Stirling*, 27 F.4th 269, 275 (4th Cir. 2022).

## III.

### Appellant's *Schlup* Actual Innocence Claim

#### A.

### The *Schlup* Standard

The Supreme Court has "recognized a limited 'actual innocence' exception to certain procedural bars to habeas review." *United States v. Jones*, 758 F.3d 579, 583 (4th Cir. 2014). In *Schlup v. Delo*, the Supreme Court recognized "that a showing of actual innocence can serve as a 'gateway,' that is, such a showing may be utilized by a § 2254 petitioner to secure the adjudication of his otherwise defaulted constitutional claims." *Wolfe I*, 565 F.3d 140, 164 (4th Cir. 2009) (discussing *Schlup v. Delo*, 513 U.S. 298 (1995)). Accordingly, "[n]ew reliable evidence of actual innocence creates a gateway for a habeas petitioner to present procedurally defaulted federal constitutional claims[.]" *Hayes v. Carver*, 922 F.3d 212, 216 (4th Cir. 2019). In *McQuiggin v. Perkins*, the Supreme Court expanded the *Schlup* actual innocence exception to also "proceed in the face of the

27

statutory time bar in 28 U.S.C. § 2244(d)(1)(D)[.]" *Jones*, 758 F.3d at 584 (discussing *McQuiggin v. Perkins*, 569 U.S. 383 (2013)).

Meeting this standard "requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. The petitioner must also "demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice." *Teleguz v. Pearson*, 689 F.3d 322, 329 (4th Cir. 2012). Once a petitioner "passes through the *Schlup* gateway by satisfying this standard, the district court then considers, and reaches the merits of, all of the petitioner's procedurally defaulted claims." *Id.*

An actual innocence finding "requires a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." *House v. Bell*, 547 U.S. 518, 539 (2006) (cleaned up). If a court finds that, "'more likely than not any reasonable juror would have reasonable doubt' as to the petitioner's guilt, then the petitioner has satisfied the *Schlup* standard." *Teleguz*, 689 F.3d at 328 (quoting *House*, 547 U.S. at 538). Because a gateway innocence claim involves evidence the trial jury did not have before it, the inquiry requires a court to assess how reasonable jurors would react to the overall, newly supplemented record. *United States v. MacDonald*, 641 F.3d 596, 613 (4th Cir. 2011) (citing *House*, 547 U.S. at 538). The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely

28

impact of the evidence on reasonable jurors. *Finch v. McKoy*, 914 F.3d 292, 299 (4th Cir. 2019).

The parties dispute the scope of this standard as applied to this case. The heart of their dispute is "whether the 'new' evidence required under *Schlup* includes only newly discovered evidence that was not available at the time of trial, or broadly encompasses all evidence that was not presented to the fact-finder during trial, *i.e.*, newly presented evidence." *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012) (discussing "circuit split" on *Schlup* standard). Restated, the question is whether "new" evidence means evidence that is wholly newly discovered evidence or simply newly presented evidence. We have already answered this query and join our sister circuits who have held that new evidence includes evidence that is newly presented. As we have explained, the *Schlup* standard is broad, encompassing both "evidence that became available only after trial" and evidence "unavailable or excluded at trial." *Royal v. Taylor*, 188 F.3d 239, 244 (4th Cir. 1999) (citing *Schlup*, 513 U.S. at 327–28).

B.

Applicability of the *Schlup* Standard

As the district court correctly noted, however, the question in this case cannot be resolved just by parsing the nature of the *Schlup* standard. Appellant pled guilty. He did not go to trial. In that context, and applying the principles delineated above, the material questions are of a more practical nature: Is the Barber Declaration "new" evidence? Is Barber a reliable declarant? And would a reasonable jury presented with the Barber

29

Declaration entertain reasonable doubt about Appellant's guilt, where Appellant pled guilty to hiring Barber to murder Petrole?

1.

The Barber Declaration Is New Evidence

Whether the Barber Declaration is "new" evidence is a question that is resolved by the context of this case. That is, at the time Appellant pled guilty, Barber had already twice exercised his Fifth Amendment privilege against self-incrimination: first, in state court on Appellant's motion to dismiss, and second, in federal court at the district court's evidentiary hearing on Appellant's motion to enforce judgment. Critically, Barber's attorney had also testified, during the habeas evidentiary hearing, that he would advise Barber to invoke the Fifth Amendment in all future proceedings: "based on the contents of th[e] tape [from the September 11 jail visit] . . . my advice will not change about whether [Barber] should testify [at Appellant's re-trial] unless there's a new development[.]" J.A. 1093. This context renders the Barber Declaration "new" because the Barber Declaration upset that status quo. It converted Barber from an unavailable witness, pursuant to his decision to invoke his Fifth Amendment privilege, into a witness who, even if not called at trial, was willing to provide a contemporaneous declaration exculpating Appellant.

Appellee argues otherwise, upon the theory that there was already evidence in the record wherein Barber had exculpated Appellant. Appellee argues the Barber Declaration was not new because it was simply a reiteration of what Barber had previously said, whether in testimony in federal court or in an affidavit or otherwise. But this characterization ignores the pivotal event wherein Newsome, Conway, and Ebert showed

30

up unannounced at Barber's jailhouse door and coerced him into exercising his Fifth Amendment privilege. And, it also ignores the consequence of that coercion -- it succeeded in taking Barber off the board for Appellant at his re-trial. This was a material event given Appellant's prior convictions, prior death sentence, and the litany of prejudicial conduct by the Commonwealth that had thus far infected Appellant's proceedings.

Appellee takes issue with this interpretation of Barber's testimony based on our decision in *Wolfe III*, where we characterized "the availability of Barber's testimony at a retrial . . . [a]s speculative." *Wolfe III*, 718 F.3d 277, 289 (4th Cir. 2013). Appellee argues that this statement undermines any determination that the Barber Declaration was "new" evidence. Namely, if we did not reasonably know at the time of Appellant's plea that Barber was going to invoke his Fifth Amendment privilege against self-incrimination, then the Barber Declaration exculpating Appellant is not "new" evidence, as Barber may have still testified in support of Appellant at the ultimate trial.

But *Wolfe III* did not rule that Barber's availability at trial was "speculative" as a matter of fact. As Appellant aptly points out, the posture in the § 2254 petition before us now is different than the posture adjudicated in *Wolfe III*. In *Wolfe III*, we considered whether sufficient "extraordinary" circumstances justified the uniquely extreme remedy imposed by the district court at the time; that is, barring the Government from re-trying Appellant for Petrole's murder. *Wolfe III*, 718 F.3d at 288 ("[P]reventing the retrial of a state criminal case is the strongest of medicine."). Indeed, in *Wolfe III* we emphasized that the remedy of a re-trial bar could apply "only in the most extraordinary of circumstances." 718 F.3d at 288 (citing *Gilliam v. Foster*, 75 F.3d 881, 905 (4th Cir. 1996) (en banc)

31

("Equitable federal court interference with ongoing state criminal proceedings should be undertaken in only the most limited, narrow, and circumscribed situations.")).

Our inquiry in *Wolfe III*, therefore, assessed whether the events up to that point amounted to the type of "limited and narrow circumstances" that could justify such an extreme remedy. 718 F.3d at 288. Thus, our finding that Barber's position was "speculative" must be read in that context. Barber's availability as a witness at re-trial was not "speculative," as a matter of fact, when we decided *Wolfe III*. Rather, Barber's availability as a witness was too "speculative" to rise to the kind of "extraordinary circumstances" that justify a habeas to court to "forbid reprosecution." *Wolfe III*, 718 F.3d at 289.

But in the present posture, where we evaluate the sufficiency of a *Schlup* actual innocence claim, Barber's testimony was reasonably unavailable at the time of Appellant's guilty plea given Barber's own testimony invoking his Fifth Amendment privilege, and the testimony of Barber's attorney that Barber would have continued to do so. That was so even if Barber's overall position was still "speculative" enough not to warrant the district court's extreme remedy barring prosecution in *Wolfe III*. We need not incorporate the extreme, limited, and constrained inquiry at work in *Wolfe III* into our *Schlup* analysis here. Indeed, to do so would be dissonant with the "broad definition of 'new' evidence" contemplated by the *Schlup* standard. *Royal*, 188 F.3d at 244; *see also House*, 547 U.S. at 538 ("[Pursuant to *Schlup*] the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'") (citations omitted).

32

Accordingly, we hold that the Barber Declaration is "new" evidence within the meaning of *Schlup*.

2.

The Barber Declaration Is Reliable Evidence

We turn next to the question of whether the Barber Declaration is reliable. Appellee makes much of Barber's purported "vacillati[on]," Appellee Br. at 27, noting that Barber originally testified to convict Appellant, and then recanted that testimony, and then pled the Fifth. Read in isolation, these facts could paint the picture of an inconsistent witness -- but only if read in isolation. When read in proper context, Barber's alleged "vacillati[on]" is entirely attributable to the Commonwealth's coercive tactic of threatening him with the death penalty if he did not cooperate and testify against Appellant.

To illustrate, as set out in the Barber Affidavit, when Barber was first arrested for Petrole's murder, Newsome and the other Commonwealth Officers "told [Barber] that they already knew that [Appellant] had hired [Barber] to kill [] Petrole." J.A. 1169. Barber "did not suggest that story to the detectives; they were the first to mention it to [him]." *Id.* While Barber was in custody, the Commonwealth Officers "repeatedly told [him] [that] they and the prosecutors knew that [Appellant] had hired [Barber] to kill [Petrole], had linked [Barber's] gun to the killing, and would pursue capital murder against either [Appellant] or [Barber]." *Id.* Unsurprisingly, "[Barber] agreed to testify against [Appellant] . . . because [he] did not want to face the death penalty." *Id.* at 1171.

Admittedly, in the years after he signed the Barber Affidavit, Barber did "waver[] in [his] additional statements about Appellant's involvement" in Petrole's murder. J.A.

33

571. As recounted in the Barber Declaration, Barber wrote several letters between 2005 and 2010 withdrawing his recantation of his trial testimony and requesting not to be called as a witness in Appellant's habeas proceedings. But, as Barber explained, he was "worried about what would happen to [him] if [he] testified in [Appellant]'s favor." *Id.* ("I was afraid of what would happen to me if I broke the cooperation deal I made with the [Commonwealth] when I pled guilty."). By the time of Appellant's November 2, 2010 habeas evidentiary hearing in federal court, however, Barber had decided "to tell the truth in court." *Id.* at 572. And, critically, the district court, sitting as the factfinder in that proceeding, found that "Barber made a *credible* recantation of his trial testimony and indicated that [Appellant] was not involved in the murder of Daniel Petrole." *Wolfe v. Clarke*, 819 F. Supp. 2d 538, 548 (E.D. Va. 2011) (emphasis supplied).

Thereafter, on September 11, 2012, mere days after we affirmed the district court's judgment vacating Appellant's convictions, Newsome, Conway, and Ebert coerced Barber into cooperating against Appellant in a prison interview without Barber's counsel present. The Commonwealth's terms to Barber were unambiguous, as they have always been: "if [Barber] testified at [Appellant's] retrial as [he] did in federal court . . . [he] would be charged with capital murder." J.A. 573. Barber's retelling of the coercive interview is corroborated by the transcript of the interview itself, wherein Ebert directly threatened Barber with death if he recanted his incriminating trial testimony in Appellant's re-trial proceedings: "we would bring the charge against you, capital murder." *Id.* at 450.

After being threatened with death anew, Barber began to invoke his Fifth Amendment privilege in Appellant's re-trial proceedings: "I believed the Commonwealth

34

would act on its threats if I testified truthfully, because the truth was what I'd stated in federal court." J.A. 575. As recounted, Barber sustained that position from 2012 until he executed the Barber Declaration in 2023.

Against this backdrop, it becomes apparent that Barber is not a "vacillating" witness. Appellee Br. at 27. He is an imprisoned man who has struggled for decades between telling the truth and preserving his own life. We cannot condone the Commonwealth's conduct in creating this dichotomy. Indeed, as we noted in *Wolfe III*, a due process claim "with respect to the Barber interview could, at the proper time, constitute a separate ground for federal habeas corpus relief." *Wolfe III*, 718 F.3d at 290. This is that time.

To hold the consequence of the Commonwealth's coercive tactics against Barber's credibility, as Appellee would have us do, defies fundamental principles of due process and justice. To the contrary, we must take the Commonwealth's acts, which were "abhorrent to the judicial process[,]" into account when considering the reliability of the Barber Declaration. *Wolfe II*, 691 F.3d 410, 424 (4th Cir. 2012) (quoting *Wolfe*, 819 F. Supp. 2d at 566 n.24). With that full picture, the Barber Declaration -- wherein Barber thoroughly exculpates Appellant and explains why he invoked his Fifth Amendment privilege after the Commonwealth threatened him with the death penalty -- is reliable. *Cf. House*, 547 U.S. at 552–54 (determining evidence that was "by no means conclusive" sufficed to establish a *Schlup* gateway claim even though, on balance, "the issue [was] close").

35

3.

<u>More Likely than Not, a Reasonable Jury Would Have Doubt as to Appellant's Guilt</u>

The final question we must answer is whether a reasonable jury presented with the Barber Declaration would, more likely than not, have reasonable doubt as to Appellant's guilt.

The rub with this question, of course, is that Appellant pled guilty to hiring Barber to shoot Petrole. But *Schlup* mandates "a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." *House*, 547 U.S. at 539 (cleaned up). And Appellant's central contention on the merits is that "his plea was involuntary because his second prosecution was unconstitutionally vindictive and because prosecutors suppressed potential exculpatory testimony from a key witness." J.A. 2149.

As Appellant has consistently argued for 13 years, across each phase of appellate review, Newsome, Conway, and Ebert coerced Barber into unavailability and thereby forced Appellant to plead guilty, rendering that plea involuntary. That coercion was compounded by the Commonwealth's facially vindictive prosecution in Appellant's re-trial proceedings. Even though he had succeeded in being awarded a new trial, Appellant faced six additional charges and the threat of Barber's original incriminating testimony because Barber had declared himself to be unavailable in federal court. Amidst this prejudice loomed the ever-present specter of the death penalty.

Considered holistically with the Barber Declaration, the facts of Appellant's criminal proceedings exemplify the rare, "truly extraordinary" case that satisfies the

36

rigorous *Schlup* standard. *House*, 547 U.S. at 537 (cleaned up). We need not evaluate the merits of Appellant's substantive claims at this juncture, but the allegations he proffers in support, buttressed by our exhaustive review of the record thus far, adequately assure us that "more likely than not[,] . . . no reasonable juror would have found [Appellant] guilty beyond a reasonable doubt." *Id.*

Indeed, the Commonwealth's conduct in this case is a textbook example of the conduct we have recognized renders a plea involuntary. As detailed in *United States v. Fisher*, that standard requires: (1) "egregiously impermissible conduct"; (2) that "was material to [Appellant's] choice" to plead guilty. 711 F.3d 460, 465 (4th Cir. 2013). Here, whenever Barber told the Commonwealth that Appellant had nothing to do with Petrole's murder, the Commonwealth dismissed his assertions and threatened him with the death penalty unless he changed his story. Certainly, that is egregious conduct that "strikes at the integrity of the prosecution as a whole." *Id.* at 466 (citation omitted). And Appellant plausibly alleges that such egregious conduct, and Barber's reaction to it, was material to his decision to plead guilty.

At its core, Appellant's *Schlup* claim rests upon the evidentiary reality that "Barber was the prosecution's **key witness** . . . and *the only witness* to provide any direct evidence regarding the 'for hire' element of the murder offense and the involvement of [Appellant] therein." *Wolfe I*, 565 F.3d at 144 (emphases supplied). In this context, where nothing else ties Appellant to Petrole's murder, the effect of Barber's recantation upon Appellant's conviction cannot be overstated. As the Commonwealth itself has admitted, without Barber, Appellant would never have been prosecuted. It follows, therefore, that with

37

Barber's recantation of his incriminating testimony, any reasonable juror would have reasonable doubt about Appellant's guilt.

Thus, on this record, we hold that it is more likely than not that any reasonable jury would have reasonable doubt about Appellant's guilt. Barber's multiple "credible" recantations, his assertions that Appellant had nothing at all to do with the crime, the weakness of the Commonwealth's case, the history of the Commonwealth's egregious misconduct, and the strength of Appellant's claims challenging the voluntariness of his plea together support that conclusion.

## IV.

For the foregoing reasons, we hold that Appellant has alleged a meritorious *Schlup* claim for actual innocence. Therefore, we vacate the district court's judgment and remand for adjudication of Appellant's substantive claims.

*VACATED AND REMANDED*